EDWARD L. HITZELBERGER *v.* STATE OF
MARYLAND

[No. 45, January Term, 1938.]

154

*Decided March 10th, 1938.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Milton H. Talkin,* for the appellant.

*Thomas N. Biddison, Assistant State's Attorney for Baltimore City,* with whom were *Herbert R. O'Conor, Attorney General, Hilary W. Gans, Deputy Attorney*

*General*, and *William H. Maynard, Deputy State's Attorney*, on the brief, for the State.

MITCHELL, J., delivered the opinion of the Court.

Edward L. Hitzelberger, the appellant, was presented on August 6th, 1937, and thereafter indicted by the grand jury of Baltimore City, for malfeasance in office. The indictment contains three counts, the first charging that, while a member of the police force of said city, the appellant permitted, connived at and allowed Shirley Kaminski and Carroll Goldstein to maintain and conduct a house of prostitution; the second, with having likewise permitted Florence Reed to maintain and conduct a house of prostitution, and the third, with having in like manner permitted Betty Byrd to maintain and conduct a similar place. He was convicted by a jury in the Criminal Court of said city, and sentenced to the Maryland Penitentiary for the period of one year, and from that judgment this appeal is taken.

The record reveals that Hitzelberger for more than twenty-six years served in various capacities on the city police force, and filled the position of lieutenant at the time of the beginning of the investigation which culminated in his indictment. At that time, and in his capacity as lieutenant, he was assigned to the Northwest District of Baltimore City, in which territory the three alleged houses of prostitution were located. All three of the above houses were raided by investigators of the Department of Justice on May 15th, 1937, and the operators or proprietors of each of them were arrested and charged with violations of the federal law. Upon the respective charges against them Carroll Goldstein, Shirley Kaminski, Florence Reed, and Betty Byrd were each sentenced to serve terms of confinement in federal prisons, by the United States District Court for the District of Maryland.

At the trial of the instant case the State produced Carroll Goldstein, who testified that he had known the appellant for more than twenty years, and at the time

of the above raid and for two and a half years prior thereto, had lived at 301 W. Dolphin Street, one of the disreputable houses in question, which was conducted by the Kaminski woman. That he formerly lived on Eutaw Street, and that at his former home he arranged a meeting between the appellant and Shirley Kaminski, at which Hitzelberger approved of the plan of the woman to open the Dolphin Street house for immoral purposes. This meeting took place about two and a half years previous to the trial, and, according to the witness, marked the beginning of the acquaintanceship between the lieutenant and Shirley Kaminski. The testimony of Goldstein tends to prove that, during the interval between the above meeting and the raid the officer was a frequent visitor to the Dolphin Street dive; that he was intimate with the proprietress and other inmates of the place; that he sought and received a small loan from the woman, and, generally, protected the place from being raided by the city authorities, through the method of furnishing Goldstein with advance information of complaints made to the police department against the Kaminski house, as and when these complaints were turned over to inferior officers of the force for investigation, and conveying to Goldstein the nature of the reports of the latter officers on the results of their investigations. The witness also testified to intimacies between the lieutenant and Florence Reed, who conducted the same type of place as did Shirley Kaminski; that, after some difficulty between the officer and the Reed woman, he arranged a conference between them, at which it was agreed that the latter could continue to operate a house of prostitution; and that later the Reed woman moved to a Bolton Street address, where she engaged in the conduct of the same nefarious practice. To the same effect the witness interviewed the officer on behalf of Betty Byrd, and obtained his tacit approval that the latter conduct a similar place of resort on Linden Avenue. The witness gave testimony tending to prove that Hitzelberger received from him, on behalf of Shirley

Kaminski, the gift of some shirts on one occasion, and three bottles of wine during the Christmas period of 1936, and that, within the year preceding the trial, the witness gave the officer some twenty year old cognac brandy. That Florence Reed gave the witness fifteen dollars to spend on a wedding present for, presumably, the lieutenant's daughter, which the lieutenant refused to accept, and which the witness kept on account of an indebtedness of thirty dollars due him from the officer. According to this witness, he was the underworld contact man between the operators of the several houses of ill fame and the lieutenant in charge of the police district in which they were severally located. This testimony is somewhat corroborated by the subsequent testimony of the defendant himself, who admitted a long and intimate acquaintanceship with Goldstein, and justified his close relationship for the reason that through such contact he obtained leads to the solution of various crimes. It is unnecessary to state that the officer denied categorically the gist of Goldstein's testimony, although he admitted that he visited the several places on various occasions, allegedly for the purpose of justifying suspicions which he entertained against the resorts, based on anonymous complaints to his department, which suspicions were not verified, in his opinion, to the extent of warranting arrests. Goldstein's narrative of the various contacts and transactions above set forth was corroborated, on the whole, by the testimony of the three women who conducted the houses, and by at least two other inmates of the places. It further appears from the record that all three of the houses of prostitution continued to operate from August 6th, 1936, to May 15th, 1937, the date of the federal raid.

Testimony was further adduced by the State, through the production of one of the federal agents who made the vice investigations which culminated in the raids of May 15th, 1937, and the subsequent prosecution hereinbefore indicated, to the effect that in the course of the investigations he tapped the telephone wire connected

with the Dolphin Street house, over which he intercepted communications between Hitzelberger and Goldstein on one occasion, the Kaminski woman and Hitzelberger on two occasions, and between the lieutenant and another inmate of the Dolphin Street house, which communications were reduced to writing at the respective times at which they were intercepted, and kept by the investigator in the form of two volumes, in which other apparently similar data was contained. It was testified by the investigator that on June 4th or 5th, 1937, he interviewed the appellant and read to him each of the above communications; and, according to his testimony, the intercepted call from Goldstein to the lieutenant, relating to the gift of brandy by the former to the latter, does not seem to have been admitted or denied on that occasion. The next call reveals the communication between the Kaminski woman and the officer with reference to an apparent money transaction between the parties, and to a proposed later visit by the lieutenant to the Kaminski house. That conversation, the investigator stated, was read to the lieutenant, who explained that the loan did not concern him personally, but that he, the officer, had sought the loan at the request of Goldstein, and promised to see that it was repaid to Shirley Kaminski in event Goldstein failed to return it. The third intercepted message appears to have been a call from Hitzelberger to Shirley Kaminski, in which he stated his inability to get to see her at that time, but inquired about some inmate of the house, and, upon invitation from Shirley, he stated he would call at the house later on. This conversation, according to the witness, was admitted by the lieutenant, with the explanation that it was intended as a jest. The next intercepted call related to a conversation between the lieutenant and an inmate of the house, in which the lieutenant was seeking to get in touch with Goldstein, and directed that the latter call him as soon as he could, on a matter which was indicated by Hitzelberger as being important. According to the investigator, the lieutenant stated that he remem-

bered making the call. Testimony of the investigator, with reference to the several readings of the intercepted telephone communications above mentioned to Hitzelberger, was substantially corroborated by a special agent of the federal government who was present at the interview between the investigator and the appellant.

Testifying in his own behalf as to the telephone communications above mentioned, Hitzelberger admitted the interview with the investigator, stating that Goldstein had advised him that the Kaminski woman had won $285 at the races, and that he, Goldstein, wanted to borrow $100 from her. He further admitted that Goldstein told the woman he would pay the lieutenant the amount of the loan by the first of May, and to call him up, which she did, and that he told her to "let me know if he doesn't, and I won't let her lose it." He further stated that one Willie Jones came to see him, stating that the woman could not loan the $100 but would loan $60; whereupon Hitzelberger stated: "It doesn't make any difference how much you lend him, but if he doesn't make good, I will stand for it." He does not appear to have been asked with regard to any of the other alleged telephone communications in his direct examination, except as to the one with reference to calling to see an inmate of the house, when he stated that he did not have the conversation; but on cross-examination admitted many calls to the house occupied by Goldstein and Shirley Kaminski, explaining that they were for the purpose of getting in touch with Goldstein in order to secure information as to other crimes. The remaining testimony introduced on behalf of the defendant was that of various officers or men connected with the police department, tending to show their respective investigations or acts of surveillance in connection with the houses which were raided, and apparently in connection with another house of ill fame. Some of these investigations or observations were made upon the initiative of the witnesses themselves or at the direction of officers in the police department other than Hitzelberger, while others were

made at the instance and under the direction of Hitzelberger.

At the trial below sixty-nine exceptions were reserved by the appellant to rulings on evidence. Nineteen of these exceptions appear to have been abandoned by the appellant in his brief and in the oral argument before this court; and, as to the remaining exceptions, counsel for the appellant has carefully grouped them in connection with the several questions raised in his argument, as follows:

"Exceptions 5, 6, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30: Did the trial court err in the admission of testimony relating to incidents and occurrences in 1934 or 1935 at Florence Reed's apartment, 1912 Bolton Street?

"Exceptions 10, 11, 12, 34: Did the trial court err in admitting evidence of gifts made to the defendant?

"Exceptions 38, 38a, 39, 40, 41, 42, 43, 44, 45, 46: Did the trial court err in admitting evidence of telephone conversations intercepted by wire tapping?

"Exceptions 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69: Did the trial court err in refusing to permit the defendant to prove the investigations made by police officers of the houses of prostitution * * * and the results thereof?

"Exceptions 13, 17, 19: Did the trial court err in admitting the evidence embraced in these exceptions?"

At common law malfeasance is a misdemeanor, and under the laws of this state crimes of this class must be prosecuted within the period of one year from the date of commission. *World v. State*, 50 Md. 49; *Curry v. State*, 117 Md. 587, 83 A. 1030; *State v. Kiefer*, 90 Md. 165, 44 A. 1043; *Archer v. State*, 145 Md. 128, 125 A. 744, 748; Code, art. 57, sec. 11. The objections to evidence raised by the appellant in the first group of exceptions above mentioned are based upon the theory that evidence relating to the nature and conduct of the houses of prostitution involved in this case, antedating the period of one year from the date of the presentment, is inadmissible. As has been indicated, the house conducted by Shirley

Kaminski is shown by the record to have been operated by her for a period of at least two and a half years prior to the date of prosecution; and the record also shows that the houses of prostitution conducted by Florence Reed and Betty Byrd were operated for at least the same length of time before the date of prosecution. The contention of the appellant is that all evidence, other than that of transactions within one year from the date of prosecution, with reference to the defendant in connection with these houses, if any, should be entirely excluded from consideration, and that there was error in admitting any such evidence. It is undoubtedly true, as a general rule, that when one is put upon trial for an offense, he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary circumstances, proof of his guilt of another offense should not be admitted. In other words, evidence of collateral facts, or of those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute, should be excluded, for the reason that such evidence tends to divert the minds of the jury from the real point in issue, and may arouse their prejudices. In addition to these reasons for the rule, the defendant, through the charges in the indictment, ordinarily would have no notice as to what evidence would develop with reference to such collateral offenses. When, however, the proof shows such connection between the different transactions as raises a fair inference of a common motive in each, evidence is admissible on other general grounds, and it is no objection that it discloses other offenses. The real test of admissibility is the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue should be admitted. *Curry v. State, supra*; *Wentz v. State*, 159 Md. 161, 150 A. 278; *Lamb v. State*, 66 Md. 285, 7 A. 399; *McAllister v. State*, 140 Md. 647, 118 A. 147; 1 *Wharton's Crim. Evid.* (11th Ed.) sec. 345.

We are not unmindful that the above statement of the

law is applicable to crimes in general, and that, as stated, it leaves out of consideration the distinction between those crimes to which the principle of limitations does not apply, and to those to which it does apply. In the instant case testimony was adduced tending to prove that Shirley Kaminski operated a house of prostitution, with the assent or approval of the appellant, for at least two years prior to the date of trial; and the trial court, evidently bearing in mind the period of limitations controlling the crime with which the appellant was charged, promptly stated that the evidence was admitted subject to exception, unless it was subsequently shown that the house continued to be operated by the Kaminski woman, pursuant to the alleged arrangement with the appellant, to a date within one year preceding the date of the prosecution, and that, upon the failure of the State to develop such facts, the entire evidence would be stricken from the record.

In the case of *Archer v. State, supra,* the defendants were charged with the crime of conspiracy, which under the law of this State is also a misdemeanor. The theory of the State in that case was that the conspiracy charged as beginning on August 11th, 1917, and January 1st, 1921, was a continuing conspiracy and was kept alive as one continuous offense. In that case the State failed to establish the continuing offense; but in the course of the trial evidence was admitted subject to exception, as was done in the instant case; and this court, in passing upon the ruling of the trial court in so admitting evidence, said: "It was proper to admit, subject to exception, testimony as to transactions occurring more than a year before the beginning of the prosecution, though it would not justify a conviction, unless followed up with proof that such acts continued up to within a year of the date of the presentment. *World v. State,* 50 Md. 49."

The crime of malfeasance may consist of one act, or a series of acts; and it therefore follows that the evidence adduced must vary in accordance with the facts of each particular case. As stated in 1 *Wharton's Crim. Evid.*

(11th Ed.), p. 491: "Where a continuing offense is charged against the accused, evidence of acts and conduct of the defendant which occurred prior to the date alleged in the indictment is admissible to show the formation of a habit continuing into the period in which the statute does not bar the prosecution."

What has been here said with reference to the rulings of the court below as to testimony relating to the transactions between the appellant and the Kaminski woman, beyond the period of limitations, applies with equal force to like transactions between the appellant and the operators of the other two houses, as all of these transactions show a continuity from their inception down to May 15th, 1937, the date on which all three houses were raided by federal authorities. It is our opinion, therefore, that there was no error in admitting the aforegoing evidence.

The second group of exceptions were reserved by the appellant to the admission of evidence tending to show gifts or gratuities to the appellant from Goldstein and the three women who conducted the several houses. Briefly, they grow out of the following questions and answers found in the testimony of Goldstein: "Q. Now, during the past year, that is from August 6th, 1936, have you given Lt. Hitzelberger any articles as gifts for either yourself, Shirley Kaminski, Florence Reed or Betty Byrd? A. I have for Shirley Kaminski. Q. What did you give Lt. Hitzelberger for Shirley Kaminski? A. One Christmas there, it was some shirts and this last Christmas three bottles of wine." That within the last year, not around Christmas time, he gave him some twenty year old cognac brandy. Q. All right, will you answer his honor's question, in addition to the things you have mentioned, have you given Hitzelberger any presents or articles in behalf of anyone? A. Only one. Florence Reed called me up." That he told Hitzelberger Florence Reed gave him $15 to buy a wedding present and "he said you keep the $15, I don't want no wedding present from her"; that he kept the $15; that Hitzelberger owed

$30 and told him to take it off that. And the following question and answer found in the testimony of Florence Reed: "Q. Did you or not on any occasion give Lt. Hitzelberger any gifts or presents? A. Yes." That about six months ago she gave Lt. Hitzelberger a present, a Stieff's silver carving set, valued at $16.50; that it was a surprise to Lt. Hitzelberger; that he called her on the telephone and thanked her for it; that he kept it; that it was new, Cappy Goldstein bought it for her.

The petty character of the alleged gifts disclosed by the above excerpts from the testimony does not indicate that the appellant was actuated by motives of graft to protect the donors from arrest and prosecution. What this evidence does tend to establish, however, is an unsavory relation between an officer of the law and those engaged in underworld practices. It is obvious that such relationship reacts against the efficiency of the officer, and that the public good is not best subserved by its existence. The testimony of the appellant which later developed in the case, lends force to this conclusion, because it affirmatively shows that he suspected each of the operators of the houses of prostitution as being violators of the law, and that he knew Goldstein over a period of many years to be a character linked with the underworld. He admitted connection with a financial transaction between two of the above parties, and that he personally guaranteed the repayment of a loan from one of them to the other. It is therefore difficult to conceive that the acceptance of donations from the parties or any of them, under such circumstances, was consonant with the duties of a diligent officer. The indictment charges the appellant with having knowingly and in willful disregard and violation of his duties as a member of the police force "permitted, connived at and allowed" the houses in question to be conducted, and, while it does not charge that the privileges were paid for in the form of bribery of the officer, it would seem that the incidents were admissible in proof of the relationship between the officer and those violating the law in his jurisdiction, as

a circumstance bearing upon the integrity of the appellant in the performance of his trust.

The exceptions found in group 3, as hereinbefore designated, raise a question of vital and far-reaching effect, in that they involve the legality *vel non* of evidence acquired through the method of what is known as tapping of wires. In recent years this question has been the subject of many interesting opinions found in the reports of the Supreme Court of the United States and the appellate courts of many States of the Union. As far as this court is concerned, however, the question is one of first impression. The common law rule is that the admissibility of evidence is not affected by the illegality of the means by which it is obtained; *Baum v. State,* 163 Md. 153, 161 A. 244; *Heyward v. State,* 161 Md. 685, 158 A. 897; and in 1 *Greenleaf on Evidence* (12th Ed.), p. 385, in commenting on this subject, the author states: "It may be mentioned in this place, that though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility if they are pertinent to the issue. The court will not take notice how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question." This unbending rule of law was evidently responsible for the adoption of the Fourth and Fifth Amendments to the Federal Constitution, and for the embodiment of articles 22 and 26 in the Declaration of Rights of this State. Doubtless the motives which inspired their adoption have, throughout the long period of years since elapsed, effected the greatest bulwark in the protection of the liberty and property rights of citizens known to government. Through the enactment of chapter 194 of the Acts of 1929, now embodied in the Code (Supp. 1935) as section 4A of article 35, it is provided: "No evidence in the trial of misdemeanors shall be deemed admissible where the same shall have been procured by, through, or in consequence of any illegal

search or seizure or of any search and seizure prohibited by the Declaration of Rights of this State; nor shall any evidence in such cases be admissible if procured by, through or in consequence of a search and seizure, the effect of the admission of which would be to compel one to give evidence against himself in a criminal case." While, therefore, before the passage of the above act, evidence obtained or secured by virtue of an illegal search, with or without warrant, otherwise admissible, was permitted in this state, it follows that, since the passage of the act, such evidence in cases of misdemeanor is no longer admissible. *Lawrence v. State,* 103 Md. 17, 63 A. 96; *Meisinger v. State,* 155 Md. 195, 141 A. 536, 142 A. 190; *Richardson v. State,* (Md.) 141 A. 538; *Heyward v. State, supra; Baum v. State, supra.*

It is argued by the appellant that article 35, section 4A, should be applied to the instant case, dealing as it does with testimony as to intercepted telephone messages, whether it is considered as evidence of the messages themselves, or as admissions made by the defendant; and in support of that contention it is submitted that the introduction of such evidence, under the facts in this case, would violate the mandates of the federal amendments and the Maryland Declaration of Rights, referred to above. With this contention we do not agree, for the obvious reason that the statute makes no reference to the interception of wire communications.

In the case of *Olmstead v. United States,* 277 U. S. 438, 48 S. Ct. 564, 567, 72 L. Ed. 944, decided in 1928, this question was carefully considered and exhaustively dealt with; and while it is true that the opinion written by the late Chief Justice Taft was adopted by a bare majority vote of the court, and that the logic found in the several dissenting opinions of the minority judges presents many thoughts for legislative consideration, nevertheless, in the absence of legislative action in this state, the majority opinion of that court is entitled to careful consideration in the solution of the question. In that case the question arose on the admissibility of

evidence secured by federal officers through means of wire tapping, and it was strenuously urged that such evidence was inadmissible as being in violation of the Fourth and Fifth Amendments. In drawing a distinction between a state of facts in the case of *Gouled v. United States*, 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647, wherein the rejected evidence was that of papers which a representative of the intelligence department of the Army by stealth obtained, and the case then under the court's consideration, Mr. Justice Taft said: "This was held an unreasonable search and seizure within the Fourth Amendment. A stealthy entrance in such circumstances became the equivalent to an entry by force. There was actual entrance into the private quarters of defendant and the taking away of something tangible. Here we have testimony only of voluntary conversations secretly overheard. The amendment itself shows that the search is to be of material things—the person, the house, his papers, or his effects. The description of the warrant necessary to make the proceeding lawful is that it must specify the place to be searched and the person or things to be seized." For that reason it was the conclusion of the court that the analogy failed. Further commenting in the same case, the court stated: "The United States takes no such care of telegraph or telephone messages as of mailed sealed letters. The amendment does not forbid what was done here. There was no searching. There was no seizure. The evidence was secured by the use of the sense of hearing and that only. There was no entry of the houses or offices of the defendants. By the invention of the telephone fifty years ago, and its application for the purpose of extending communications, one can talk with another at a far distant place. The language of the amendment cannot be extended and expanded to include telephone wires, reaching to the whole world from the defendant's house or office. The intervening wires are not part of his house or office, any more than are the highways along which they are stretched."

It may be noted, in connection with the above quotation from the learned Chief Justice, that, in the instant case, the wires which were tapped, as distinguished from the *Olmstead* case, were not the private wires of the defendant. While it is not necessary, for the purpose of this opinion, to deal further as to the phase of the matter now under consideration, nevertheless, because the question is raised in the appellant's brief, we deem it appropriate to state that since the decision in the *Olmstead* case Congress has enacted what is commonly known as the Federal Communications Act of June 19th, 1934, and that section 605 thereof, U. S. Code, title 47, sec. 605, 47 U. S. C. Ann., sec. 605, provides in part: "No person receiving or assisting in receiving, or transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, to any person other than the addressee, his agent, or attorney, * * * or in response to a subpena issued by a court of competent jurisdiction, or on demand of other lawful authority; and no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person."

As will readily be observed from an examination of the above section of the Communications Act, it is applicable to interstate or foreign communications only, and since the passage of the act it has been so construed. In line with the latter construction, the ruling in the *Olmstead* case, in so far as federal courts are concerned, is no longer controlling. *Nardone v. United States*, 302 U. S. 379, 58 S. Ct. 275, 82 L. Ed. 250. The objection that the intercepted telephone messages were read by the investigator from volumes alleged to contain transcripts of other intercepted telephone messages relating to the Dolphin Street house, is not well taken. The volumes

as a whole were not attempted to be introduced in evidence, and only the specific intercepted telephone messages, which related to conversations in which the defendant participated, were read to the jury. Inasmuch as the witness testified that the same intercepted messages had been previously read to the appellant, and the latter did not deny that fact, but on the contrary admitted the previous reading and gave his own version of the incidents in explanation, we are of the opinion that they were properly admitted.

Under group 4 of the exceptions, objection is urged that the trial court was in error in refusing to admit testimony of officers of the police force with reference to various investigations of the several alleged houses of prostitution made by them, either upon their own initiative or under orders from superior officers other than the appellant, and without the latter's knowledge. The purpose of this testimony obviously was to establish the fact that the result of these investigations was fruitless, in that no evidence that the houses were being conducted for the purpose of prostitution was, on the occasions mentioned, detected, and consequently no arrests were made. In this connection it is proper to state that the record discloses that testimony as to a number of similar investigations, made either by the appellant in person or under his direct orders, with his full knowledge, and with like results, was admitted; and it is our opinion in this regard that both rulings were correct. The refusal to admit the first line of testimony was evidently proper, because the appellant was in no manner connected with the first class of investigation. It might well have been true that a number of investigations of the houses, made entirely independent of the co-operation and knowledge of the defendant, failed to discover evidence warranting arrest, and yet at the same time the houses may have been of the character alleged. At best, such evidence could only be construed as an effort to establish a fact by negative proof. The question for investigation was not whether on some occasions the

houses were conducted in an orderly manner, but whether they were conducted as houses of prostitution with the knowledge and acquiescence of the defendant; and for that reason it is evident that the trial court drew the distinction, and permitted the defendant to adduce evidence tending to show his own diligence in making arrests. Having received the benefit of such evidence as was designed to establish his diligence as an officer, it does not follow that he was entitled to amplify such testimony with negative proof.

The three exceptions found in the last group relate to questions propounded a witness, either by counsel for the State or by the court, as to whether the appellant knew the character of the houses in question. The inquiries did not seek an expression of opinion from the witness, but elicited his knowledge of the subject of inquiry, and were therefore free from objection.

*Judgment affirmed, with costs.*