STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. MICHAEL HOZER, DEFENDANT-APPELLANT.

Argued June 6, 1955—Decided June 27, 1955.

Mr. *James A. Major* argued the cause for appellant (*Mr. Joseph H. Gaudielle*, on the brief).

Mr. *Ralph L. Fusco* argued the cause for respondent (*Mr. Guy W. Calissi*, Bergen County Prosecutor, attorney; *Mr. Fusco* of counsel).

The opinion of the court was delivered by

WILLIAM J. BRENNAN, JR., J. A jury in the Bergen County Court convicted defendant upon both counts of an indictment for nonfeasance in his office as Sergeant of Detectives of the Police Department of Cliffside Park. His appeal to the Superior Court, Appellate Division, was certified here on our own motion.

The headquarters and control center of a widespread gambling operation conducted by Frank Erickson were located at 452 and 454 Palisade Avenue, Cliffside Park. They were established in 1945 and operated over five years without interference from law enforcement authorities. Erickson employed about a dozen "sitters" who worked daily at various locations outside Cliffside Park taking bets over the telephone, usually on horse racing but some times on other sporting events. The sitters neither received nor paid out moneys at their telephone locations. They noted on a small ticket the amount of each bet, the name of the horse, and the name of each player who telephoned his bet, and each night at the close of the day's business delivered the tickets to 452 Palisade Avenue. The sitters came to 452 Palisade Avenue the following morning at about 8 o'clock and remained until 9 or 9:30 tabulating the results of the previous day's play. Each sitter consulted the *Morning Telegraph* or the *Racing Form,* sources recognized as official by the gambling fraternity, to ascertain the winner and the pari-mutuel odds of the races run the day before, and tabulated from the slips each player's wins and losses on sheets called horse pads provided by Erickson. The slips were discarded when the recordings on the horse pads were completed.

Erickson's principal lieutenants were Clarence Lennon and Albert Levy. Lennon handled the money, and Levy kept the books. Each sitter turned over his completed horse pad to Levy and left before 9:30 A. M. to start the day's work at his telephone. Levy, Lennon and a few other employees worked all day at headquarters. Levy prepared "recap" sheets which showed the previous day's net result for each player, that is, whether the player won or lost. If the player

won, Lennon drew a check on an account in Lennon's name, and the check was mailed to the player. On occasions, winnings were paid in cash, delivered to the player by messenger. If the player lost, he was told by telephone the amount of his loss and was expected to mail a check to a postoffice box in Cliffside Park, or deliver cash in the amount of his losses to a messenger.

One Albert Klauser, in Erickson's employ at 452 Palisade Avenue, usually picked up the mail from the postoffice box. He was arrested on the steps of the postoffice one day in 1948, and he and Lennon were subsequently indicted and convicted on February 9, 1949 for conspiracy to violate the gambling laws. The proofs at their trial showed that one of the players was almost continuously in Lennon's debt for lost wagers and had made total payments to Lennon exceeding $100,000, *State v. Lennon*, 3 *N. J.* 337, 340 (1949). The magnitude of Erickson's operations in Cliffside Park may be readily inferred from that circumstance.

Erickson took the lease to 452 Palisade Avenue in 1945 in the name of Henry Pellino, his tax accountant doing business in New York City. He caused the legend "Henry Pellino, Accountant" to be put on the front window, but Pellino objected and it was removed and replaced by the legend "William Fernbacher, Auto Accessories." Fernbacher was one of Erickson's close associates, although listed as his chauffeur. Neither an accountant's office nor an auto accessories business was ever carried on at the place.

Erickson continued his operations at 452 and 454 Palisade Avenue after the arrest of Lennon and Klauser. Operations did not cease until about May 1, 1950 after Erickson's activities were spotlighted by the Kefauver Congressional crime investigation and newspaper publicity. Erickson and Levy were indicted for the operation on February 28, 1951, and upon entering pleas of guilty or *non vult* were sentenced on November 14, 1952.

Telephones at the headquarters were an absolute necessity in the operation, for contacts with players, the sitters and other bookmakers. Erickson also carried on a lay-off business,

accepting lay-off bets from other bookmakers desirous of hedging against large losses. The telephone at 452 Palisade Avenue, originally in Pellino's name, was disconnected in 1947. Thereafter arrangements were made with tenants of apartments in both buildings for the use of their telephones and also for the use of the telephone of one Brunas who operated a camera shop under the name of Home Movies in the store at 454. The tenants and Brunas turned over their monthly telephone bills to Levy, and Lennon made payment thereof. Levy had a buzzer installed in Brunas' shop which Brunas used to summon Levy from the premises at 452 when there was a call for him on the Brunas telephone.

The first count of the indictment charges Hozer with nonfeasance as to 452 Palisade Avenue, and the second count as to 454 Palisade Avenue. It is charged that at each place there was maintained between January 1, 1945 and May 1, 1950 a gaming and betting house "wherein * * * bookmaking * * * and * * * the practices of bookmaking * * * were maintained and conducted * * *," that defendant "then and there well knew" of such activity but "unlawfully did wilfully, deliberately and by design continuously neglect and omit to perform [his] * * * public duties" as Sergeant of Detectives of the Police Department "enjoined upon him by law" and intentionally failed in his duty in this regard "for the purpose of suffering and allowing the person or persons responsible therefor to escape detection, apprehension, seizure and punishment * * *."

## I.

Hozer's first point is that there was no proof of criminal activities at 452 and 454 Palisade Avenue and that he was therefore entitled to a directed judgment of acquittal on his motions made at the close of the State's case and at the close of the entire case. He contends that the activity described was neither "bookmaking" nor the "conduct of practices commonly known as bookmaking" denounced by *R. S.* 2:135–3, which was the statute in effect at the time.

Admittedly Erickson's activity hardly resembled that of the bookmaker, long familiar to the English and American turf, whose calling gave the trade its name, and who personally made his own book of bets at the track and personally settled his wins and losses with his bettors. Erickson magnified the relatively simple personal transaction into big business, developing a huge combine centered at Cliffside Park from which he sent forth his sitters to distant places to gather in the bets which he harvested at Cliffside Park where he kept the books and settled the accounts.

The settled definition of bookmaking under the statute is "the making or taking and recording or registering of bets or wagers on races and kindred contests," *State v. Morano*, 134 *N. J. L.* 295, 299 (*E. & A.* 1946). Erickson's method of operation presents a novel factual situation for the application of the definition and in that sense the issue raised here is one of first impression in our appellate courts. The defendants in previous cases made bets directly with bettors and not, as did Erickson, through sitters at telephones distant from his gaming plant. *State v. Lennon, supra; State v. O'Shea*, 16 *N. J.* 1 (1954); *State v. Bogen*, 13 *N. J.* 137 (1953); *State v. Rhams*, 14 *N. J.* 282 (1954); *State v. Maranz*, 18 *N. J. Super.* 478 (*App. Div.* 1952), certification denied 10 *N. J.* 309 (1952).

The gist of Hozer's argument seemingly is that, as it was the sitters at places distant from Cliffside Park who actually took the bets from the bettors and noted them on slips, Erickson's activities at Cliffside Park lacked an essential ingredient of the crime defined in the *Morano* case. The argument has force but, we think, no merit when Erickson's activities are considered in the light of the crime the statute was designed to reach. As Justice Heher noted in his opinion in the *Morano* case, our State has long been committed through constitutional prohibitions to an "all embracive" policy against all forms of gambling, except as specifically sanctioned, and "the design of the provision against bookmaking is * * * to enforce the general anti-gaming policy," 134 *N. J. L.*, at *pages* 299–300. The statute is to be

interpreted in that light and, so considered, brings Erickson's operations at Cliffside Park within the sweep of "bookmaking" and "bookmaking practices." The outlying sitters simply worked at the finger tips of the hand which directed and controlled the criminal enterprise. Erickson was a bookmaker, " 'one who makes a book on a race or other doubtful event; a professional betting man,' " *State v. Morano*, 134 *N. J. L.*, at *page* 297, and the activities pursued by him and his confederates at 452 and 454 Palisade Avenue constituted "bookmaking" and "bookmaking practices."

## II.

 Hozer next argues that the allegation that he "well knew" of the unlawful use was not sustained by evidence. We think there was a plentitude of proof supporting the jury finding that he knew of the use. He did not confess or in anywise admit his knowledge, and ordinarily it is not possible otherwise to offer specific evidence of knowledge. *Cf. State v. Doto*, 16 *N. J.* 397 (1954). The conclusion must rest here on the proofs inferring that when he investigated the places several times over the years, his investigations were simply gestures to give the semblance of investigations which were not such in fact, giving rise to the inference that he knew the use being made of the premises but permitted the continuance of the unlawful enterprise.

The two places were under suspicion from the time operations began in 1945. In November 1945 Hozer visited 452 Palisade Avenue with Assistant Prosecutor Toth who was under instructions to determine if there were any gambling activities there. Toth testified there was no evidence of any, but his testimony definitely established that Hozer was familiar from the beginning with the suspicions held of the places and also that the activities suspected were gambling activities.

Hozer was not a neophyte in this type of investigation. He testified that he had made 25 or more other such investigations in the course of duty. The chief of police testified that he ordered Hozer to investigate Erickson's premises

"probably four or five times." Yet the evidence was that when the chief of police ordered him in 1947 and 1948 to make inquiries requested by the prosecutor as to telephones listed at the two places, he made no inquiry of the telephone company as to what the company records showed, or of any other source where the inquiry might be fruitful, but merely "checked" the premises and reported that he could find no evidence of an incriminating nature. According to Brunas, who had the telephone at 454, in his Home Movies shop, Hozer came in "two or three times. Why he came I really don't know, but he seemed to look around, stood there from 10 to 15 minutes" and "asked no questions about the use of the telephone or anything else." In contrast, Brunas said that when "the County men" investigated, they "came in and went through my store thoroughly."

Hozer's manner of investigating Henry Pellino's telephone listing at 452 in 1948 is illustrative. The prosecutor's letter which prompted the inquiry listed several phones, including Pellino's, but showed that that listing was discontinued 18 months earlier, on January 7, 1947. Despite this Hozer went to 452 looking for a telephone. The door was open and he walked in but he said no one was there. He didn't bother to go into the back room where the work was done, but looked into it from the anteroom. He saw some desks but no papers were visible, although he conceded that he was on the lookout "to see if anything was laying around of a suspicious nature." Finding no telephone, he left. But he wrote the prosecutor, "I personally investigated all the names and failed to find any of those phones being used for illicit purposes." It is understandable that he admitted on the stand, "Well, in that instance it would be a superficial search."

There was, throughout the period, the evidence before Hozer's eyes that the premises were not being used for the advertised law-abiding purposes of an accountant's office or an auto accessories shop. This in itself would naturally give rise to the inquiry in the mind of the conscientious police officer as to what use was really being made of the premises,

particularly in a police officer skilled in this kind of investigation and assigned to make inquiries because of the strong suspicions held of the place. In that setting we have no difficulty in concluding that the State's case fully sufficed to present a jury question as to Hozer's knowledge. We add that his own testimony strengthens, if, indeed, it does not compel the inference: Among other damaging inferential admissions he testified that he had known Lennon for many years and knew that he lived on Palisade Avenue in a house opposite 452. He also said that he was very familiar with Lennon's 1948 arrest and conviction. Yet he admitted that he never at any time questioned or attempted to question Lennon about Lennon's possible connection with the activities at 452 and 454 or tried to learn from Lennon whether he had information about the places.

██ Hozer's brief does not argue error in the court's charge on the issue of knowledge. At the oral argument, however, the matter was the subject of colloquy between the members of the court and counsel. We are satisfied that the charge, read in its entirety, made clear to the jury that mere negligence in making an adequate inquiry would not suffice as the basis of an inference of knowledge and evil intent and that the State's burden was to prove actual knowledge, or knowledge of such facts from which it might reasonably be inferred that Hozer had knowledge of the illegal activity. The gist of the charge was that knowledge of unlawful activity was a prerequisite to Hozer's guilt, but that the jury were to decide from the proofs (which sufficed for the purpose) whether that knowledge was to be inferred. Such is the pertinent law.

### III.

██ ██ Hozer next argues that somehow he was exonerated by the statute of limitations. The operations at 452 and 454 Palisade Avenue ceased on May 1, 1950. If the two-year statute of limitations under *N. J. S.* 2*A* :159-2 (formerly *R. S.* 2 :183-2) applied to Erickson and his fellow wrongdoers, they were indictable until May 1, 1952. If the four-

year period under *N. J. S.* 2*A*:159–4 applied, they were indictable until May 1, 1954. In either event, the indictment filed March 10, 1953 against Hozer was timely. His duty as to the offenders continued throughout the period while they were liable to prosecution, and, until the lapse of two years after the statute ran in their favor, he was indictable for his willful failure to discharge that duty. *State v. McFeeley,* 136 *N. J. L.* 102 (*Sup. Ct.* 1947); and see *State v. Weleck,* 10 *N. J.* 355, 374 (1952).

█ A related question is the asserted error in the trial court's refusal to strike from the case any reference to furniture and equipment used for gambling. The argument is grounded in the contention that as to the equipment the statute of limitations began to run in Hozer's favor on May 1, 1950, when Erickson stopped operations. But Hozer never seized the equipment. It was allowed to remain in the possession of the wrongdoers and to be removed by them when the activity stopped. The equipment in their hands was subject to seizure at least as long as the wrongdoers were subject to prosecution.

## IV.

█ Next, error is assigned in the denial of a mistrial for alleged prejudicial remarks of the prosecutor. One of the defendant's witnesses, a former county detective, was being cross-examined by the prosecutor as to an investigation at 452 and 454 Palisade Avenue on April 21, 1950. The prosecutor interrupted the examination to ask that other witnesses in the courtroom "formerly connected with the prosecutor's office who may be called as defense witnesses" be asked to leave. The stated reason for the request was, "I don't think they should find out what the answers are going to be and what the nature of the examination is, in advance." Defense counsel objected that this was a "bombshell," "it reflects upon the integrity of people who are still in good standing in the community." The prosecutor retorted, "Some of these people are not in good standing. Mr. Gaudielle [defense counsel] knows that." If we assume that

the prosecutor's comment, though provoked by defense counsel, was improper, we fail to see any prejudice justifying a mistrial. The remarks themselves do not appear to be inherently prejudicial to the defendant, and at all events the trial judge fully and adequately cautioned the jury to ignore the remarks of both counsel. *Cf. State v. Witte*, 13 *N. J.* 598, 611 (1953); *State v. Bogen*, 13 *N. J.* 137 (1953).

## V.

The State produced as a witness one Lupo, one of Erickson's sitters. On cross-examination, defense counsel asked the witness if he had been arrested, and the State's objection to the question was sustained. Hozer argues that this was error, contending that any witness may be cross-examined as to facts showing his favor toward the party calling him. We may acknowledge that this is sound as a statement of general principle. But here counsel at the trial stated that he wanted to show that Lupo was not arrested "in order to show that the witness, probably was given a special consideration and that he expected favors and gain from the testimony that he would give; if your Honor, please, I have the right to interrogate this witness whether he was arrested, indicted and prosecuted for his acts." The mere fact that Lupo was not arrested, indicted or prosecuted would not, standing alone, support an inference that the prosecutor had promised him immunity from prosecution in return for his testimony against this defendant. At all events, the matter rested in the sound discretion of the trial judge, see *Annotation*, 20 *A. L. R. 2d* 1421, 1437 (1951), and we cannot say that the judge's discretion was mistakenly exercised in the absence of any proof or offer of proof of such a promise.

## VI.

Hozer urges error in the refusal of the trial court to charge certain requests. We have examined the requests and are satisfied that those having substance were adequately

covered in the court's charge and that the others were not pertinent to the issues raised by the indictment. Special comment is required only as to the refusal to charge the request that the defendant must be acquitted if the jury found that the "person or persons who kept and maintained the premises were actually arrested and convicted for so doing." This reference is to the stipulation that Erickson was indicted on February 28, 1951 and sentenced on November 14, 1952. We do not see how the diligence of other law enforcement agencies in apprehending and convicting Erickson would exculpate Hozer for his failure to do so, but need not decide the point. At all events, others associated with Erickson in the venture had not been prosecuted in the period ending May 1, 1952.

## VII.

Finally Hozer claims that the trial judge improperly exercised his discretion in sending the jury back for further deliberations when, after being out for eight hours, they reported that they were deadlocked six to six. The judge advised the jury, "After careful consideration I am of the opinion at the present time, in view of all the time elements and the nature of the case, I feel constrained I must require you to return to the jury room and continue your deliberations toward reaching a verdict."

This determination was well within the discretion of the trial judge. See *Annotation*, 85 *A. L. R.* 1420 (1933). We find nothing in either 'the circumstances or the court's statement suggesting any element of improper coercion. *Cf. In re Stern*, 11 *N. J.* 584 (1953).

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For reversal*—None.