# JAMES EDWARD DUNCAN *v.* STATE OF MARYLAND

[No. 1226, September Term, 1976.]

*Decided September 14, 1977.*

The cause was argued before GILBERT, C. J., and MENCHINE and MASON, JJ.

*Robert Paul Mann* for appellant.

*Amicus curiae* brief filed by Joseph R. Suter, *Russell J. White* on the brief.

*Kathleen M. Sweeney, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Sandra A. O'Connor, State's Attorney for Baltimore County, Charles · A. Ruppersberger, III, Assistant State's Attorney for*

*Baltimore County,* and *David F. Mister, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

James Edward Duncan, a Baltimore County Police Officer, was convicted in a bench trial of the common law crime of misconduct in office. He received a suspended sentence of one year imprisonment and was placed on probation for eighteen months. In this appeal, he makes the following contentions: (1) that the evidence was legally insufficient to establish the offense charged; and (2) that prosecution was barred by the Statute of Limitations.

## Sufficiency of the Evidence

There was testimony by one Michael R. Mally that during 1970, when he was dating the daughter of Officer Duncan, the latter brought his attention to the fact that the officer had become aware from police wanted flyers that Mally was AWOL from the United States Army. Mally alleged that at that point Officer Duncan had declared that, "He would keep the flyer from being served on me if I . . . got him things when he asked me to obtain things for him." Mally then proceeded to detail a great many items of personal property acquired by Mally for Duncan. Mally said that the items had been obtained from fences or by the use of bad checks, and that the circumstances of his acquisition of the items were known to Duncan. Mally testified that he obtained the personal property for Duncan from before Christmas of 1970 "all through . . . 'til I went to, just right before I went to jail. January I think it was the 10th of 1975, and right up to about the week before I went to jail."

The following excerpt from the cross-examination of Mally gave further amplification of his reasons for obtaining personal property for Duncan:

"Q You are suggesting to the court the reason why you did all these things for Duncan for little or no money is the fact that he was going to turn you in because you were AWOL?

A Not just that. Among other things, he took care of me when I got arrested for other things, or he'd keep the police off my back in Baltimore County, until one State Trooper got down on me, and he stayed on me, and, you know, I guess you could say he finally got me, because I'm serving time now, but — . . . For that purpose, and among other things, you know, recommendation when I got arrested for other things, that I was going for my own recognizance, he'd keep the police off my back, he would keep the Check Squad off my back, him and [another officer]. And they did these things for me in turn for the things I did for them."

Duncan denied that he had received many of the articles of personalty allegedly delivered to him by Mally, but acknowledged receipt of the following items:

| Item | Date of Transaction | Mally's alleged source of acquisition |
| --- | --- | --- |
| 1. .38 cal. Revolver | Early 1971 | From fence |
| 2. Automobile Starter | Summer 1972 | "        " |
| 3. Coppertone Stove | 1973 | "        " |
| 4. Deer Meat | ? | Illegal hunting |
| 5. Beef | ? | Bad checks |
| 6. Washing Machine | Summer 1974 | "        " |
| 7. Multicolored Carpet | Fall 1974 | "        " |
| 8. Blue Shag Carpet | Fall 1974 | "        " |
| 9. Suede Coat | December 1974 | "        " |

For purposes of passing upon the legal sufficiency of the evidence we find it necessary to discuss only the above items.

Duncan acknowledged that the gun, the washing machine and the carpeting, all were new when acquired from Mally. He said he was aware that Mally had worked for a plumbing and heating firm; for the Bethlehem Steel Company, and for

various marinas and knew that he had never worked in a retail store.

Duncan acknowledged that all of those new items had been obtained directly from Mally and never from a store. He said he never questioned the manner of Mally's acquisitions. His explanation for his failure to do so as to the four new items was as follows:

### The Gun

"Q  Why did you decide to purchase this revolver from Michael Mally as opposed to going to a gun store?

A  Well, if you go to a gun store, a weapon of that caliber at the time was selling approximately for $75.00 to $80.00. And the gun, the pistol was brand new, and Michael told me where he had purchased it at, and he even told me he had the receipt at home, which I never verified. However, like I say, the fact is he wanted $50.00 for it. I said, fine. I checked the gun out first; it was not stolen. I give him the $50.00 on February 6th, 1971.

Q  Again, where did Michael say he purchased the gun?

A  Marvin's Gun Store in Essex.

Q  You never checked with Marvin's Gun Store, did you?

A  No. The boy stated he had a receipt.

Q  Did you ever see the receipt?

A  No, sir; I never asked him for it."

### The Washing Machine

"Q  Why did you not go to Basin's, and pay them the money, rather than pay it to Michael Mally?

A  I wasn't buying it from Basin's, I was buying it from Michael Mally.

Q  Why?

A Because he's the one that gave me the price on the washing machine. I shopped around for washing machines, the wife and I, and there was a variance of prices, $25.00 to $30.00 difference.

Q Did you think that Michael Mally was a retailer or wholesaler in washing machines?

A No, sir, I didn't.

\* \* \*

Q Did you wonder why Michael Mally was acting as a go-between between yourself and Basin's, when you knew the washing machine came from Basin's?

A No, I never questioned why.

Q You never asked Michael Mally how he could get you this discount?

A No, I didn't."

*Blue Shag Carpeting*

"Q So he came to your house? What was his reason for coming to the house at that time, if you know?

A Well, he come to the house, and stated to my wife and myself that he seen the Carpet Fair truck out there, wanted to know if she needed any carpet. My wife said, why, Mike? He said, I got a friend I'm helping install carpets, and I'm sure I can get you a discount on the remnants. So at that time he said, do you have any specific color in mind? We said, well, we're sticking with the blue shag we just had installed by Carpet Fair.

Q So what did he say to you?

A He said, well, I'll check on it, and I'll get back with you in a day or two.

Q Did he say from whom he would get these rugs?

A   No, other than the fact the fellow he was supposed to be working with installing carpeting."

### Multicolor Carpeting

"Q . . . From whom did you purchase such multicolored carpeting?

A   Michael Mally.

Q   Approximately when did this purchase take place, when did you actually get the carpeting from Michael Mally?

A   I'd say about the last of May of 1974.

Q   And how did a conversation come up between you — was there a conversation between you and Michael Mally, previous to the purchase by you of some carpeting from Mally, was there a conversation?

A   Michael Mally brought approximately a twelve by sixteen piece of indoor-outdoor multicolored carpeting to my home.

Q   Did it just come in out of the blue, or had you previously had a conversation?

A   I had no conversation with him prior to that. He had a folded rug, brought it over to my house, and asked me if I was interested in purchasing the carpet.

Q   Did he say who he was getting it from?

A   He said his mother and father was having their basement redone, and it was a piece left over.

Q   Did you buy it then or later buy it at all?

A   He come back over that evening, and I paid him a hundred dollars for the carpeting."

### The Suede Coat

"Michael called me approximately 6:30, it was just dark, and he said, Mr. Jim, he said, I have a nice suede coat, would Miss Barb be able to use it? I

said, what do you mean, Mike? He said, you know, Kathy and I split up, and I bought the coat in hopes of some reconciliation in giving Kathy the coat, and Kathy refuses to take the coat, and I'm stuck with it. I need some money. I said, how much are you talking about? He said, I'll take $45.00 for it. I said, where is the coat now? He said, I'm over home; I'll meet you out front. Can you come over right now? I said yes. I got in my automobile. I went over to his home. He met me in front of his home. He had this brown suede or rust-colored suede coat. And I looked at the coat and the size, gave him the $45.00, left his house, . . ."[1]

Duncan denied knowledge that Mally had obtained the personalty from fences or by the use of bad checks. There was, however, testimony by a Maryland State Trooper that: "[Duncan] told me he received the property from Mally, that he knew that Mally was buying things with bad checks and selling them." A captain of Baltimore County Police confirmed that a statement to that effect had been made in his presence by Duncan.

Even in the absence of such an acknowledgement by Duncan, we are persuaded that the frequency of Mally's deliveries to Duncan and the variety of items delivered, would have alerted the most obtuse to have questioned Mally's source of supply and have led the most credulous to believe there was a strong probability of taint in their acquisition.

In *Chester v. State,* 32 Md. App. 593, 605, 363 A. 2d 605, 612, (1976), *cert. den.,* 278 Md. 718 (1976), we cited with

---

1. Cross-examination of appellant included the following:

"Q  Weren't you suspicious Mally gave you this coat with no label at all in it?

A  No, sir.

Q  In the course of your investigations of burglaries and breaking and enterings, is it not true that quite often items subject to be stolen are things like coats, appliances?

A  Sure."

approval the following quotation from Perkins, Crim. Law 2d Ed.-UTB, at 482-83:

> "The prevention of outside influences tending toward corruption is not the only social interest in the official action of public officers. It is socially desirable, so far as reasonably possible, to insure that no public officer shall, in the exercise of the duties of his office *or while acting under color of his office,* (1) do any act which is wrongful in itself — malfeasance, (2) do any otherwise lawful act in a wrongful manner — misfeasance, or (3) omit to do any act which is required of him by the duties of his office — nonfeasance. And any corrupt violation by an officer in any of these three ways is a common-law misdemeanor known by some such name as 'misconduct in office' or 'official misconduct.' "

We commented that this common law offense is wide-ranging and comprehensive.

That the offense has application to police officers is not open to doubt. *Hitzelberger v. State,* 174 Md. 152, 197 A. 605 (1938).

We are persuaded that the trial judge reasonably could have concluded that the State had shown, beyond a reasonable doubt that the course followed by Duncan from before Christmas 1970 through January 1, 1975, was wrongful in itself and that it was pursued under color of his office. There was legally sufficient evidence to convict appellant of misconduct in office.

### *Limitations*

The Annotated Code of Maryland, Cts. & Jud. Proc. § 5-106 (1974) reads in pertinent part as follows:

> "§ 5-106. *Prosecution for misdemeanor.*
>
> (a) *One year.* — Except as provided by this section, a prosecution for a misdemeanor not made punishable by confinement in the penitentiary by

statute shall be instituted within one year after the offense was committed."

The above recodification of the Statute of Limitations on misdemeanors intended no change in the effect and meaning of the prior law (Md. Ann. Code Art. 57, § 11). *McMorris v. State*, 26 Md. App. 660, 665, 338 A. 2d 912, 915 (1975), *aff'd. McMorris v. State*, 277 Md. 62, 64, 355 A. 2d 438, 439-440 (1976).

The State acknowledges that the beginning of the prosecution in this case was the date of presentment — March 13, 1976 (State br. p. 7). The latest specific transaction between Duncan and Mally related to the suede coat delivered in the first or second week of December 1974. Mally also had stated, in general, non-specific terms, that his dealings with Duncan had continued until January 1975.

There is, accordingly, not a scintilla of evidence of any transaction between Duncan and Mally occurring within one year prior to the commencement of prosecution. The State contends, however, that misconduct in office is a "continuing offense," prosecution for which is permissible without limitation, so long as the officer retained improperly obtained goods.

We think that *Hitzelberger v. State, supra*, and *Purviance v. State*, 185 Md. 189, 44 A. 2d 474 (1945), cited by the State as supportive of that contention, fail to do so. *Hitzelberger* and *Purviance* used the phrase "continuing offense" in the context of the admissibility of evidence, not in relationship to a statute of limitations. *Purviance* makes this distinction crystal clear in the following language:

> "Article 57, Section 11 of the Code, 1939, forbids the commencement of a prosecution for the crime with which the defendant is here charged beyond the period of one year from the time of its commission. It does not forbid offering in evidence other facts which occurred a year before the commission of the offense charged if those acts have a natural tendency to establish the fact at

issue. Article 57, Section 11, *supra*, is a limitation against prosecution, not a limitation against the introduction of evidence of relevant acts or of crimes other than those for which the defendant is on trial." 185 Md. at 198, 44 A. 2d at 477-78.

There are, however, cases in which the continuing offense principle has been applied to charges of misconduct in office under circumstances similar to those existing here. They are *State v. McFeeley*, 54 A. 2d 797 (N.J. 1947), and *State v. Hozer*, 116 A. 2d 193 (N.J. 1955).

In *McFeeley* it was said at 800-01:

"It is contended by the defendants that the indictment was found after the period of the statute of limitations had expired. That statute (R.S. 2:183-2, N.J.S.A.) provides: 'No person shall be prosecuted, tried or punished for any offense not punishable with death, unless the indictment therefor shall be found within two years from the time of committing the offense or incurring the fine or forfeiture. * * *'

"If all of the offenses charged against the defendants were of acts which were due to be done or omitted by them before the beginning of the two year period and not thereafter, the point would have been well made; but the statute fixes no period within which it is the duty of police officials to take steps toward the laying of complaints and the prosecuting of violators of the law. Some crimes are continuing. State v. Ireland, 126 N.J.L. 444, 20 A.2d 69. An unlawful return of gambling furniture is not a continuing crime. If seized furniture is returned, the offense is complete as of the time of the return; there is no offense as to it until then and none thereafter. If, in the instant case, the furniture seized on January 6, 1942, was unlawfully returned before February 27, 1943, the statute bars a prosecution begun on February 27, 1945; and if the furniture was returned after February 27, 1943, the

indictment, for the sake of uncertainty and to enable the accused to plead intelligently, should assign a date within the two year period. But on the other hand, if on January 6, 1942, certain persons were apprehended by the police in the act of committing a misdemeanor, those persons would be subject to prosecution for two years thereafter and no reason is shown to us why a police officer whose duty is to lodge a proper complaint against them does not remain under that duty throughout the period when the offenders are liable to prosecution, provided, of course, the officer retains his public position that long. Therefore, according to the allegations of the indictment, the defendants were under such a duty until January 6, 1944, and if, as alleged, they willfully neglected throughout that period to perform the duty of lodging complaints, they were subject to prosecution on account thereof at the time the present indictment was returned. We conclude that the statute of limitations had not run against that accusation."

In *Hozer, supra,* it was said:

"Hozer next argues that somehow he was exonerated by the statute of limitations. The operations at 452 and 454 Palisade Avenue ceased on May 1, 1950. If the two-year statute of limitations under N.J.S. 2A:159-2, N.J.S.A. (formerly R.S. 2:183-2) applied to Erickson and his fellow wrongdoers, they were indictable until May 1, 1952. If the four-year period under N.J.S. 2A:159-4, N.J.S.A. applied, they were indictable until May 1, 1954. In either event, the indictment filed March 10, 1953 against Hozer was timely. His duty as to the offenders continued throughout the period while they were liable to prosecution, and, until the lapse of two years after the statute ran in their favor, he was indictable for his willful failure to discharge that duty. State v. McFeeley, 136

N.J.L. 102, 54 A. 2d 797 (Sup. Ct 1947); and see State v. Weleck, 10 N.J. 355, 374, 91 A. 2d 751 (1952)." 116 A. 2d at 198.

The reasoning of the opinions in *McFeeley* and *Hozer* is persuasive in the subject case. Mally would have been subject to prosecution in the suede coat bad check case until November 1975.[2] Thus under the *McFeeley, Hozer* rule, Duncan would have been under a continuing obligation as a police officer to bring Mally to justice until the latter date. His presentment on March 16, 1976, thus would be within one year of the time he last wilfully neglected to perform his duty, *i.e.*, to lodge a complaint against Mally.

Tending to counterpoise those decisions, however, is the rule of construction declared by the United States Supreme Court in *Toussie v. United States*, 397 U. S. 112, 114-15, 90 S. Ct. 858, 860, 25 L.Ed.2d 156, 161 (1970), where the Court stated:

"The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity. For these reasons and others, we have stated before 'the principle that criminal limitations statutes are "to be liberally interpreted in favor of repose," United States v. Scharton, 285 US 518, 522, 76 L Ed 917,

---

2. There was evidence showing that Mally had obtained the suede coat and other goods from Linda Lynn of Baltimore, Inc. in November 1974, by giving a bad check at the time of acquisition.

919, 52 S Ct 416 (1932).' United States v Habig, 390 US 222, 227, 19 L Ed 2d 1055, 1059, 88 S Ct 926 (1968). We have also said that '[s]tatutes of limitations normally begin to run when the crime is complete.' Pendergast v United States, 317 US 412, 418, 87 L Ed 368, 372, 63 S Ct 268 (1943); see United States v Irvine, 98 US 450, 452, 25 L Ed 193, 194, (1879). And Congress has declared a policy that the statute of limitations should not be extended '[e]xcept as otherwise expressly provided by law.' 18 USC § 3282. These principles indicate that the doctrine of continuing offenses should be applied in only limited circumstances since, as the Court of Appeals correctly observed in this case, '[t]he tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends the statute beyond its stated term.' 410 F2d, at 1158. These considerations do not mean that a particular offense should never be construed as a continuing one. They do, however, require that such a result should not be reached unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one."

We are confronted, accordingly, with the question whether the *McFeeley, Hozer* rule should be applied or whether the general rule declared in *Toussie, supra,* bars its application under the facts of this case.

A somewhat analogous issue confronted the Court in *State v. Webb,* 311 So. 2d 190 (Dist. Ct. App., 2d. Dist., Fla. 1975), *cert. den.* 317 So. 2d. 768 (1975). In *Webb* the general manager of a radio station on May 12, 1970, installed and commenced and continued using radio equipment in his station that he knew had been stolen on May 11, 1970. Webb was arrested and charged on July 20, 1973, more than three

years after receipt and use of the equipment. On these facts a divided [3] Court said:

> "The sole point on appeal is whether or not the crime of receiving and concealing stolen property under Fla.Stat. § 811.16 is a 'continuing offense' or whether or not the statute of limitations of two years as provided in Fla.Stat. § 932.465(2) begins to run on May 12, 1970, when Dexter installed the radio equipment on the premises of the radio station with the full knowledge of Webb at that time that the equipment was stolen.

> "We hold that the crime of receiving and concealing stolen property is not a continuing offense and that the statute of limitations begins to run when the crime is complete, to wit: when the property is received and concealed with the knowledge that the same is stolen." 311 So. 2d. at 191.

The majority opinion went on to cite the quotation from *Toussie, supra,* that we previously have quoted in this opinion and added:

> "The court in *Toussie, supra,* also held that legislative silence in a statute is 'strongly in favor of not construing this act as incorporating a continuing-offense theory.' Fla.Stat. § 811.16 is completely silent on the concept of a continuing offense and the nature of the crime is not such that the legislature assuredly intended that it be treated as such.

> "The crime charged in this case was complete and the statute of limitations began to run on May 12, 1970, when Webb received and concealed the radio equipment, knowing at that time it was stolen property. United States v. Irvine, 98 U.S. 450, 25 L.Ed. 193; Warren v. United States, 199 Fed. 753;

---

3. The division was 2-1 in a three judge panel, the Chief Judge dissenting.

Grunewald v. United States, 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931; United States v. Mendoza (D.C.Cal.) 122 F.Supp. 367.

"Fla.Stat. § 811.16, being silent as to the concept of a continuing offense, is like the federal statute involved in *Toussie, supra.* If we reverse this case we would be creating an exception to the statute of limitations by rewriting a plain and unambiguous statute. This we are not authorized to do, as such authority is vested exclusively in our legislature." 311 So. 2d. at 192.

The dissenting judge said:

"I dissent. I accept, of course, Toussie v. United States, *supra,* as good law and refer specifically to that portion of the opinion therein quoted above, and italicized in part in the majority opinion, viz.:

'[Well recognized principles indicating that the doctrine of continuing offenses should be applied in only limited circumstances] . . . do not mean that a particular offense should never be construed as a continuing one. They do, however, require that such a result should not be reached unless the explicit language of the substantive criminal statute compels such a conclusion, *or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one.'* (Italics added.)

I would emphasize, however, that portion thereof which I have immediately hereinabove italicized relating to the *nature* of the crime involved. That is to say, I think that if the very essence of the crime charged is *concealment,* as here, the legislature 'must assuredly have intended' that the crime is a continuing one until discovery is made. Otherwise, as in this very case, for example, it would be a boon to the 'fencing' business; and a buyer of known stolen goods need only carefully conceal them for

two years after which he would be home free. The failure of the legislature *expressly* to declare a continuing offense may be logically explained, I think, by the fact that the statute, i. e., § 811.16, *supra*, also proscribes the buying and receiving of stolen property. As to those crimes, assuming no involvement of any aspect of concealment, I would agree with the majority; but as to a charge the essence of which *is* concealment, I would, and do, dissent." 311 So. 2d. at 192-93.

We find the reasoning of the dissenting opinion particularly applicable to the subject case. The conduct of a police officer in concealing his knowledge of continuing criminal activity by another is an act wrongful in itself. Such concealment alone will establish the *corpus delicti* of the offense of misconduct in office so long as the officer's knowledge of such continuing criminal activity co-exists with a continuing duty to disclose it.[4] Limitations against prosecution of a police officer in such a case never will commence until that date upon which the offender himself no longer could be brought to book for the concealed offense.

We see no reason to believe that the Legislature, by passage of § 5-106, *supra*, intended to relieve Duncan of "the duty of police officers to take steps toward laying of complaints and the prosecution of violators of the law" after one year from the date of his discovery of the offense. *McFeeley, supra*. Indeed, the exception to the rule that criminal limitations statutes are to be liberally interpreted in favor of repose, acknowledged in *Toussie, supra*, seems clearly applicable. In this case we see no conflict between application of the continuing offense doctrine and the general rule of law set forth in *Toussie, supra*.

Finding no error, we shall affirm.

*Judgment affirmed.*
*Appellant to pay the costs.*

---

4. Duncan remained on active duty up to the time of presentment — March 16, 1976.