## TOUSSIE v. UNITED STATES

No. 441.   Argued January 14, 1970—Decided March 2, 1970

*Murray I. Gurfein* argued the cause for petitioner. With him on the briefs was *Jacob W. Heller.*

*Francis X. Beytagh, Jr.,* argued the cause for the United States.   With him on the brief were *Solicitor General Griswold, Assistant Attorney General Wilson, Jerome M. Feit,* and *Edward Fenig.*

MR. JUSTICE BLACK delivered the opinion of the Court.

Petitioner Robert Toussie was convicted, after a jury trial, of failing to register for the draft.   His conviction was affirmed by the Court of Appeals, 410 F. 2d 1156

(C. A. 2d Cir.), and we granted certiorari, 396 U. S. 875 (1969). For the reasons hereafter set forth we conclude that this prosecution was barred by the statute of limitations and therefore reverse the conviction.

Section 3 of the Universal Military Training and Service Act, 65 Stat. 76, provides that:

> "Except as otherwise provided in this title, it shall be the duty of every male citizen . . . who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder." [1]

The applicable presidential proclamation provides that "[p]ersons who were born on or after September 19, 1930, shall be registered on the day they attain the eighteenth anniversary of the day of their birth, or within five days thereafter." [2] Since Toussie, an American citizen, was born on June 23, 1941, he was required to register sometime between June 23 and June 28, 1959. He did not do so during that period or at any time thereafter. On May 3, 1967, he was indicted for failing to register and that indictment led to the conviction under review.

---

[1] 50 U. S. C. App. § 453. This Act was amended by the Military Selective Service Act of 1967, 81 Stat. 100, but those amendments did not change this provision. Failure to perform this duty is punishable by fine, imprisonment, or both. 50 U. S. C. App. § 462 (a) (1964 ed., Supp. IV).

[2] Proclamation No. 2799, July 20, 1948, 62 Stat. 1531. The Proclamation was first issued under the authority of the Selective Service Act of 1948, 62 Stat. 604, but it was continued after the passage of the Universal Military Training and Service Act by Proclamation No. 2942, August 30, 1951, 65 Stat. c35.

Before trial Toussie moved to dismiss the indictment, arguing that prosecution was barred by the statute of limitations which provides that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found . . . within five years next after such offense shall have been committed." 18 U. S. C. § 3282. Since there is no express provision to the contrary in the Draft Act, Toussie argued that his crime was complete in 1959, and it could not be the subject of a prosecution based on an indictment returned in 1967— eight years thereafter. The Government agreed that the crime was complete in 1959, but argued that it continued to be committed each day that Toussie did not register. The District Court held that the Act imposes a continuing duty to register which lasts until age 26 and that prosecution for failing to perform that duty before the man becomes 26 is timely if the indictment is returned before the defendant becomes 31 years old— in this case any time prior to June 23, 1972. 280 F. Supp. 473, 474 (D. C. E. D. N. Y. 1967). The Court of Appeals agreed. 410 F. 2d, at 1157–1158. If the offense is a continuing one the prosecution was timely, but, if not, the District Court erred in not dismissing the indictment.

In deciding when the statute of limitations begins to run in a given case several considerations guide our decision. The purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions. Such a limitation is designed to protect individuals from having to defend themselves against charges when the basic facts may have become obscured by the passage of time and to minimize the danger of official punishment

because of acts in the far-distant past. Such a time limit may also have the salutary effect of encouraging law enforcement officials promptly to investigate suspected criminal activity. For these reasons and others, we have stated before "the principle that criminal limitations statutes are 'to be liberally interpreted in favor of repose,' *United States* v. *Scharton,* 285 U. S. 518, 522 (1932)." *United States* v. *Habig,* 390 U. S. 222, 227 (1968). We have also said that "[s]tatutes of limitations normally begin to run when the crime is complete." *Pendergast* v. *United States,* 317 U. S. 412, 418 (1943); see *United States* v. *Irvine,* 98 U. S. 450, 452 (1879). And Congress has declared a policy that the statute of limitations should not be extended "[e]xcept as otherwise expressly provided by law." 18 U. S. C. § 3282. These principles indicate that the doctrine of continuing offenses should be applied in only limited circumstances since, as the Court of Appeals correctly observed in this case, "[t]he tension between the purpose of a statute of limitations and the continuing offense doctrine is apparent; the latter, for all practical purposes, extends the statute beyond its stated term." 410 F. 2d, at 1158. These considerations do not mean that a particular offense should never be construed as a continuing one. They do, however, require that such a result should not be reached unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one.

The statute in this case provides that all young men, with certain exceptions, between the ages of 18 and 26 shall register "at such time or times and place or places" as the President may prescribe. The Government refers to a regulation promulgated under the Act which pro-

vides that "[t]he duty of every person subject to registration . . . shall continue at all times, and if for any reason any such person is not registered on the day or one of the days fixed for his registration, he shall immediately present himself for and submit to registration . . . ." 32 CFR § 1611.7 (c). It is urged that this regulation only makes explicit what Congress implicitly said in the Act itself, that is that registration is a duty that continues until age 26 and failure to register before then is a criminal offense that can be punished as late as five years after the 26th birthday.

The statute admittedly might be construed as the Government urges, but in light of the history of the draft laws and the principle that continuing offenses are not to be too readily found, we do not feel this particular Act incorporates such a doctrine. The draft law of 1917 provided in § 5 that certain persons were subject to registration and that "upon proclamation by the President . . . stating the time and place of such registration it shall be the duty of all [such] persons . . . to present themselves for and submit to registration." 40 Stat. 80. Pursuant to that authority the President proclaimed June 5, 1917, as the first registration day,[3] and on that day approximately 10,000,000 young men were registered.[4] There were no more general draft registrations until August 24, 1918, when the President required all those men who had become subject to registration since June 5, 1917, to come in and register.[5] Later that year Congress amended the statute, expanded the age group subject to registration,[6] and provided that "upon

---

[3] Proclamation of May 18, 1917, 40 Stat. 1664.

[4] U. S. Selective Service System, Registration and Selective Service 11 (1946).

[5] Proclamation of August 13, 1918, 40 Stat. 1834.

[6] The first registration was of all men between the ages of 21 and 30. 40 Stat. 80. In 1918 Congress expanded the group to all those between the ages of 18 and 45. 40 Stat. 955.

proclamation by the President . . . stating the time or times and place or places of . . . registration, it shall be the duty of all persons of the designated ages . . . to present themselves for and submit to registration . . . ." 40 Stat. 955–956. Although this provision seemingly would have authorized registrations on different days, the President again issued a proclamation designating a single day, September 12, 1918, as registration day for all those so subject.[7] That registration was the last under the World War I draft. It is thus clear that throughout the administration of the first draft law, registration was thought of as a single, instantaneous act to be performed at a given time, and failure to register at that time was a completed criminal offense.

As events developed prior to what became World War II, Congress again decided to draft young men for service in the Armed Forces. In the Selective Training and Service Act of 1940 it was provided that men subject to registration were to register "at such time or times and place or places, and in such manner and in such age group or groups, as shall be determined by rules and regulations prescribed hereunder." 54 Stat. 885. While this language would again have authorized registration on different days for different men, the first proclamation under the new Act set a uniform date, October 16, 1940, for the registration of all men.[8] It was not until two years later that the President first issued a proclamation setting forth different dates for the registration of different groups of men, and in that same proclamation the President established the basic registration procedure of the present system, that all young men shall register on their 18th birthday.[9]

---

[7] Proclamation of August 31, 1918, 40 Stat. 1840.

[8] Proclamation No. 2425, September 16, 1940, 54 Stat. 2739.

[9] Proclamation No. 2572, November 17, 1942, 56 Stat. 1982.

After the 1940 Act expired on March 31, 1947, Congress again decided to register men for the draft and declared that men between the ages of 18 and 26 would be subject to registration. Selective Service Act of 1948, 62 Stat. 604. Since the authority to register under the 1940 Act had expired, it was necessary to provide for the initial registration of the entire group of men between 18 and 26. In language identical to that found in the statute involved in this case,[10] Congress again left the administrative details to the President and authorized registration "at such time or times and place or places" as he might designate. We do not think the imposition of the duty to register on men between 18 and 26 and the provision for registration at different times was intended to indicate that the statute of limitations did not begin to run when the crime was first complete. Since at the time of the initial registration under the 1948 Act there were men of various ages who had to be registered, the Act was phrased generally in terms of a duty imposed on the entire group. Under this authority the President in fact required registration of all men between 18 and 26 during the month of September 1948. Persons of different ages were required to register on different days, and all those born after September 19, 1930, were required to register "on the day they attain the eighteenth anniversary of the day of their birth, or within five days thereafter."[11] The registration provisions of that Act have remained in force since 1948, and there has thus been a continual registration of 18-year-olds shortly after their birthday. With the exception of a few men who are not subject to registration when they are 18 but may become

---

[10] See *supra*, at 113.

[11] See *supra*, at 113, and Proclamation No. 2799, July 20, 1948, 62 Stat. 1531.

so later on,[12] the effect of these provisions has been to eliminate the necessity for registrations of men older than 18. Viewed in the light of history we do not think the Act intended to treat continued failure to register as a renewal of the original crime or the repeated commission of new offenses, but rather perpetuated the conception of the first registration that a man must register at a particular time and his failure to do so at that time is a single offense. That time will not be the same day for all as it was in 1917, and from the Selective Service System's viewpoint the process of registration is a "continuing" one. But from the registrant's viewpoint the obligation arises at a specific time. In Toussie's case it arose when he turned 18. He was allowed a five-day period in which to fulfill the duty, but when he did not do so he then and there committed the crime of failing to register.

The Government points out that the "continuing duty" regulation has been in existence since before the passage of the 1948 Act,[13] and that most lower federal courts have held that failing to register is a continuing offense for purposes of applying the statute of limitations.[14] It is suggested that since Congress has legislated

---

[12] For example, students at certain military colleges are exempted from registration. 50 U. S. C. App. § 456 (a)(1) (1964 ed., Supp. IV). If a student in such an institution withdraws, he would presumably be required to register since the Act specifically states that "[n]o exemption from registration . . . shall continue after the cause therefor ceases to exist." 50 U. S. C. App. § 456 (k). Thus such a student may not be required to register until some time after his 18th birthday.

[13] The regulation was first promulgated under the 1940 Act on June 4, 1941. Selective Service System Regulations Vol. 2, § IX, 205 (d), 6 Fed. Reg. 2747.

[14] See Fogel v. United States, 162 F. 2d 54 (C. A. 5th Cir.), cert. denied, 332 U. S. 791 (1947); Gara v. United States, 178 F. 2d 38, 40 (C. A. 6th Cir. 1949), aff'd by an equally divided Court,

several times in this field, its failure to indicate that the crime should not be treated as a continuing offense supports the Government's argument that it is. Petitioner on the other hand suggests that Congress has on occasion explicitly stated that a certain offense will be deemed a continuing one,[15] and its failure to do so in this statute indicates that it did not intend to adopt that theory. Since there is no specific evidence that Congress actually was aware of this limitations question when it acted—whatever weight such evidence might deserve—and since we are reluctant to imply a continuing offense except in limited circumstances, we conclude that any argument based on congressional silence is stronger in favor of not construing this Act as incorporating a continuing-offense theory.

Unlike other instances in which this Court has held that a particular statute describes a continuing offense, there is no language in this Act that clearly contemplates a prolonged course of conduct.[16] While it is true that

---

340 U. S. 857 (1950); *McGregor* v. *United States*, 206 F. 2d 583 (C. A. 4th Cir. 1953); cf. *United States* v. *Guertler*, 147 F. 2d 796 (C. A. 2d Cir. 1945). But cf. *United States* v. *Salberg*, 287 F. 208 (D. C. N. D. Ohio 1923).

[15] Congress has provided that concealment of a bankrupt's assets shall "be deemed to be a continuing offense . . . and the period of limitations shall not begin to run until . . . final discharge or denial of discharge." 18 U. S. C. § 3284.

[16] Cf. *United States* v. *Cores*, 356 U. S. 405 (1958), in which the Court held, for venue purposes, that the statute prohibiting alien crewmen from remaining in the United States after their permits expired contemplated that the offense would continue as long as the crewman remained in this country and the statute of limitations did not start to run when he first overstayed his permit. In that case we stated that "[s]ection 252 (c) punishes '[a]ny alien crewman who willfully remains in the United States in excess of the number of days allowed.' The conduct proscribed is the affirmative act of willfully remaining, and the crucial word 'remains' permits no connotation other than continuing presence." *Id.*, at 408. See also *Armour*

the regulation does in explicit terms refer to registration as a continuing duty, we cannot give it the effect of making this criminal offense a continuing one. Since such offenses are not to be implied except in limited circumstances, and since questions of limitations are fundamentally matters of legislative not administrative decision, we think this regulation should not be relied upon effectively to stretch a five-year statute of limitations into a 13-year one, unless the statute itself, apart from the regulation, justifies that conclusion.[17]

---

*Packing Co.* v. *United States,* 209 U. S. 56 (1908), in which we held that, for venue purposes, violations of the Elkins Act, 32 Stat. 847, were continuing offenses. In that case the statute specifically provided that "[e]very violation . . . shall be prosecuted in any court of the United States having jurisdiction of crimes within the district in which such violation was committed or through which the transportation may have been conducted . . . ." *Id.,* at 73. Both of these cases dealt with venue and did not involve the statute of limitations question presented in this case.

[17] It is significant that the courts that have concluded that failure to register is a continuing offense have done so by relying explicitly on the regulation. See *Fogel* v. *United States, supra,* at 55; *McGregor* v. *United States, supra,* at 584; *Gara* v. *United States, supra,* at 39; and the opinions below in this case, 280 F. Supp., at 474, 410 F. 2d, at 1157. It is equally significant that the only court that concluded that the offense was not a continuing one did so at a time when there was no "continuing-duty" regulation issued to implement the registration provisions. *United States* v. *Salberg, supra,* interpreting the 1917 Draft Act, held that failure to register was not a continuing offense. The first continuing-duty regulation was promulgated in 1941. See n. 13, *supra.* These decisions support our conclusion that the statute itself, apart from any reliance on the administrative regulation, does not require that it be construed to incorporate a continuing-offense theory. We do not hold, as the dissent seems to imply, *post,* at 127, that the continuing-duty regulation is unauthorized by the Act. All we hold is that neither the regulation nor the Act itself requires that failure to register be treated as the type of offense that effectively extends the statute of limitations.

There is also nothing inherent in the act of registration itself which makes failure to do so a continuing crime. Failing to register is not like a conspiracy which the Court has held continues as long as the conspirators engage in overt acts in furtherance of their plot. See *United States* v. *Kissel,* 218 U. S. 601 (1910), *Grunewald* v. *United States,* 353 U. S. 391 (1957). It is in the nature of a conspiracy that each day's acts bring a renewed threat of the substantive evil Congress sought to prevent. The fact that the first draft registrations clearly were viewed as instantaneous events and not a continuing process indicates that there is nothing inherent in the nature of failing to register that makes it a continuing offense.

We do not mean that the argument in support of implying a continuing offense in this case is insubstantial, but it is at best highly equivocal. Basically we are faced with the task of construing a somewhat ambiguous statute in one of two ways. One way would limit institution of prosecution to a period of five years following the initial violation, while the other could effectively extend the final date for prosecution until as late as 13 years after the crime is first complete. As we have said before:

> "when choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication." *United States* v. *Universal Corp.,* 344 U. S. 218, 221–222 (1952).

Not insignificantly those remarks were also made in the context of considering the continuing-offense doctrine. In light of all these considerations we conclude that the

draft law does not intend to permit criminal prosecution for failing to register as late as 13 years after the initial failure. Consequently the statute of limitations begins to run at the initial failure to register as required by law. Since the facts in this case clearly show that Toussie failed in his legal obligation when he did not register prior to June 28, 1959, the statute began to run at that time and prosecution based on an indictment returned almost eight years later was barred.

It should be emphasized that this conclusion does not mean that the gravity of this offense is in any way diminished. Failure to register is subject to heavy criminal penalties. The only question is whether those penalties must result from a prosecution begun within five years or whether they can be delayed for a longer period. We are not convinced that limiting prosecution to a period of five years following the initial failure to register will significantly impair either the essential function of raising an army or the prosecution of those who fail to register. We do feel that the threat of criminal punishment and the five-year statute of limitations is a sufficient incentive to encourage compliance with the registration requirements. If Congress had felt otherwise it could easily have provided for a longer period of limitations. It has not yet done so.

There is no doubt that the jury found that Toussie willfully failed to register and thereby subject himself to the same possibility of military service that faces other young men who fully comply with their legal obligations. There is some cause to feel that dismissal of the indictment in such a case is an injustice in a society based on full and equal application of the laws. But while Congress has said that failure to register is a crime, it has also made prosecution subject to the statute of limitations. "Every statute of limitations, of course, may permit a rogue to escape," *Pendergast* v. *United States,*

317 U. S. 412, 418 (1943), but when a court concludes that the statute does bar a given prosecution, it must give effect to the clear expression of congressional will that in such a case "no person shall be prosecuted, tried, or punished." The judgment of conviction in this case must therefore be

*Reversed.*

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE and MR. JUSTICE HARLAN join, dissenting.

The general statute of limitations provides in pertinent part that "[e]xcept as otherwise expressly provided by law, no person shall be prosecuted . . . unless the indictment is found . . . within five years next after such offense shall have been committed." 18 U. S. C. § 3282. The majority holds that this statute bars petitioner's prosecution, shortly before his 26th birthday, for failing ever to have registered for the draft. That conclusion, I submit, is supported by neither the language, the purpose, nor the history of the applicable Selective Service Acts.

It is at once clear that nothing is gained by stressing that the general statute of limitations applies "[e]xcept as otherwise expressly provided by law." The question in this case is not whether the five-year statute applies, but when it begins to run. That question in turn depends on what the "offense" is for which petitioner is being tried, and when it was that he committed that offense. In the typical case, an offense is complete as soon as every element in the crime occurs, and the statute of limitations begins to run from that date. But in the case of a "continuing offense," the crime is not exhausted for purposes of the statute of limitations as long as the proscribed course of conduct continues. *United States v. Cores,* 356 U. S. 405, 409 (1958); *United States v. Kissel,* 218 U. S. 601, 607 (1910); see Model Penal Code

§ 1.07, Comment (Tent. Draft No. 5, 1956). The question into which category a given offense falls has long been held to be entirely a matter of statutory interpretation. See, *e. g., United States* v. *Cores, supra; Pendergast* v. *United States,* 317 U. S. 412, 419–421 (1943); *Bramblett* v. *United States,* 97 U. S. App. D. C. 330, 332, 231 F. 2d 489, 491, cert. denied, 350 U. S. 1015 (1956).

In this case, the offense derives from 50 U. S. C. App. §§ 453 and 462 (a) (1964 ed. and Supp. IV). The latter section makes it a crime to evade registration or to "neglect or refuse to perform any duty" required by the Selective Service laws. The former section—453—spells out the "duty" that petitioner is charged with failing to perform here:

> "[I]t shall be the duty of every male citizen of the United States, and every other male person now or hereafter in the United States, who, on the day or days fixed for the first or any subsequent registration, is between the ages of eighteen and twenty-six, to present himself for and submit to registration at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder."

By any natural reading of this language, at least where the President has established "times" and "places" for continually accepting registrations, the "offense" created is the offense of being at one and the same time, unregistered after having been required to register, and being between the ages of 18 and 26. Indeed, coupled with § 462's provision for punishment of anyone who "evades" registration, this crime is very similar to the crime committed by an alien who unlawfully "remains" in the country. See *United States* v. *Cores, supra;* majority

126

opinion, *ante,* at 120 n. 16. Under this view of the Act, the only question that the statute of limitations raises is whether, at any time within five years preceding the indictment, those two characteristics—being unregistered and between the specified age limits—accurately described the accused.

The majority concludes, however, that the only duty prescribed by § 453 is a duty to register on those specific days—and those days only—declared by the President for initial registrations. In this case, by presidential proclamation, persons not yet 18 in 1948 were to "be registered on the day they attain the eighteenth anniversary of the day of their birth, or within five days thereafter." According to the majority, once the fifth day has passed, the unregistered 18-year-old, although he has indeed committed an offense, is no longer under any further obligation to register. That conclusion is wholly at odds with the purposes of the Selective Service Act as a whole and this section in particular, as well as with the regulations, longstanding administrative interpretation, and the presidential proclamation itself.

Since 1941, Selective Service regulations, issued under authority explicitly granted the President, 50 U. S. C. App. § 460 (1964 ed. and Supp. IV); 32 CFR pt. 1611 (invoking authority under § 460), have provided that:

> "The duty of every person subject to registration to present himself for and submit to registration shall continue at all times, and if for any reason any such person is not registered on the day or one of the days fixed for his registration, he shall immediately present himself for and submit to registration before the local board in the area where he happens to be." 32 CFR § 1611.7 (c).

If there was any doubt as to whether the duty imposed by § 453 extends beyond the fifth day after petitioner's

birthday, this regulation surely sets that issue at rest.[1] Indeed, the Court apparently concedes as much since it decides to fall back on the theory that the regulation is not authorized by the Act.[2]

---

[1] Despite the majority's assertion to the contrary, the quoted regulation is neither the first nor the only regulation reflecting the expectation that registration was to occur, even though it was "late" registration. Even under the 1917 Act, the regulations "prescribed by the President under the authority vested in him by the terms of the Selective Service Law," U. S. War Dept., Selective Service Regulations, p. i (2d ed. 1918), provided for registration "other than on Registration Day . . . irrespective of the date on which [the applicant] was required to register." *Id., § 54;* see U. S. War Dept., Selective Service Regulations § 54 (1917) ("Local Boards will accomplish the registration of persons subject to registration who, *for any reason,* have not been registered on or since [Registration Day]") (emphasis added). Similarly, under the 1940 Act, procedures were described for registering "[a]ll persons who present themselves for registration, *including persons who should have registered on a previous registration day . . . .*" 32 CFR § 613.11 (b) (Cum. Supp. 1944) (emphasis added). And the current regulations provide that "[t]he Director of Selective Service shall also arrange for and supervise the registration of persons who present themselves for registration at times other than on the day or days fixed for any registration." 32 CFR § 1612.1.

It is incongruous, to say the least, to admit that local boards have a duty and responsibility to register late applicants, see also 32 CFR § 1611.6, but that such applicants have no corresponding duty to cooperate with the board. Presumably under the majority's view, an unregistered male, discovered by the local board after the time for his initial registration had passed, could not be punished if he "refuses to cooperate or is inclined to evade, refuses to answer, or answers falsely . . . ." See 32 CFR § 1613.16 (provision for dealing with "recalcitrants").

[2] The majority seems concerned to distinguish the "limitations question," *ante,* at 120, from the question of whether the duty in this case is continuing, *ante,* at 121 n. 17. But the Court cannot have it both ways. If the duty continues, as the regulation prescribes, the limitations question has been settled: the definition of the "offense" was not yet exhausted when this indictment was brought. *United States* v. *Cores,* 356 U. S. 405, 409 (1958); *United States* v. *Kissel,* 218 U. S. 601, 607 (1910). If, on the other hand, the

That position, however, is simply untenable. In addition to the general authorization to the President in § 460 (b) "to prescribe the necessary rules and regulations to carry out the provisions of this title," § 453 itself expressly requires registration "at such time or times and place or places, and in such manner, as shall be determined by proclamation of the President and by rules and regulations prescribed hereunder." The majority's reference to the 1917 Act, if it proves anything, proves just the opposite of the Court's conclusion. Under that Act, the President prescribed one day when registration was to take place, utilizing local election precincts and a registration system that were not well adapted to take registrations on any other day.[3] By 1942, the system had been

statute has run, then the "continuing-duty" regulation must be invalid. While I can sympathize with the Court's discomfort over the position it is thus forced to assume, I view that unease as simply an additional indication that the regulations involved in this case are fully within the scope of the powers given the President under the Act.

[3] The first registration is described in U. S. Selective Service System, Registration and Selective Service 10–11 (1946):

"The basic idea was to follow the general organization and the administrative units of the election machinery. The Governors in the States, the County Clerks, or other designated persons in the county and in registration precincts were selected or appointed registrars. The ordinary place of registration was the ordinary place for voting. Thus the normal processes of Government were utilized for this extraordinary activity."

Although it appears that late registration by local boards after Registration Day was authorized by the President, see n. 1, *supra*, until World War II and the 1940 Act, the local boards' "primary functions [were] not registration but classification and induction." *Id.*, at 23. Once Registration Day had passed, and the emergency machinery had been dismantled, special procedures were required for accomplishing late registration, see U. S. War Dept., Selective Service Regulations § 54 (b) (2d ed. 1918), and "local boards had difficulty with the proper entry or handling of registrations which, too often

streamlined to the point where local boards were open every day for the purpose of accepting new registrations. The current regulations are nothing more or less than a setting of "times" and "places" (your nearest local board during the usual business hours)[4] for late as well as timely registrations. Within five years prior to the bringing of this indictment, petitioner—in the words of the statute—had a "time" and a "place" to register, "determined by proclamation of the President and by rules and regulations prescribed" by the President.

Despite the majority's implication to the contrary, *ante*, at 120, there is specific evidence that Congress actually was aware of this question when it acted, and that Congress did not expect that the duty to register would cease merely because the times set for initial registration had passed. During the hearings on the 1940 Act, Senator Reynolds asked then-Major Hershey whether a person could avoid his duty to register altogether by, for example, joining the National Guard—which would give him an exemption—and then getting out as soon as registration day had passed. Major Hershey replied that such persons would have to register as soon as they lost their exempt status, and he persisted in that answer

---

for insufficient reason, were received late." U. S. Selective Service System, *supra,* at 91. Significantly, during subsequent registration days under the 1917 Act, when the boards once again had the help of special machinery, tens of thousands of tardy registrations were effected. *Id.,* at 15. By 1941, the boards were equipped to handle late registrations as a matter of course, resulting in the issuance of the "continuing-duty" regulation. See *id.,* at 42, 91–92.

[4] See, for example, in addition to the "continuing-duty" regulation, the following regulation designating the "Place and time of registration":

"Any person required to be registered may present himself for and submit to registration at any designated place of registration or at the office of any local board during the hours for registration specified in the Presidential proclamation *or during the usual business hours.*" 32 CFR § 1613.1 (a) (emphasis added).

despite the Senator's puzzlement (like the majority's) over the fact that the registration period would seem to have expired. The Senator finally accepted Major Hershey's explanation after assuring himself that "your registration boards are at all times in session . . . [a]nd they would be given the opportunity to register." [5] Even the relevant presidential proclamation, wholly apart from the "continuing-duty" regulation, accords with this view that the duty to register is not defined solely in terms of the setting of the sun on the day originally fixed for registration. The proclamation declares that a person unable to register on the day fixed for his registration "because of circumstances beyond his control . . . shall do so as soon as possible after the cause for such inability ceases to exist." [6] Apparently, the majority concedes that in what it calls these few "exceptions," the Act does impose a valid duty to register on a day other than the initial date. That being the case, it is inconceivable to me that Congress can be said to have authorized the President to require late registration of those with a good excuse for their tardiness, but not to have similarly authorized him to require late registration of those with a bad excuse or no excuse at all.

The "continuing-duty" view of § 453 receives support from an appraisal of the section's purpose in the context

---

[5] Hearings on S. 4164 before the Senate Committee on Military Affairs, 76th Cong., 3d Sess., 385 (1940). See also the exchange between Senator Reynolds—by then Chairman of the Committee—and General Hershey during hearings a year later on an amendment to the 1940 Act, pointing out that the Act "gives a broad discretion to call these men in as the Army sees fit . . . [a]nd to register them as they see fit." Hearings on S. 2126 before the Senate Committee on Military Affairs, 77th Cong., 1st Sess., 34 (1941).

[6] Proclamation No. 2799, July 20, 1948, 62 Stat. 1531, 13 Fed. Reg. 4173. Similar language is contained in the Supplementing Proclamation, No. 2942, August 30, 1951, 65 Stat. c36.

of the statute considered as a whole. Immediately following the registration requirement, § 454 declares that "every male citizen . . . who is between the ages of 18 years and 6 months and 26 years, at the time fixed for his registration, or who attains the age of 18 years and 6 months after having been required to register pursuant to [§ 453] shall be liable for training and service in the Armed Forces . . . ." Since even under the majority's view, petitioner was at one time a person "required to register," this section, by its literal terms, made him still liable for induction at the time this indictment was brought. But if he still had a duty to serve, then it is completely illogical to conclude that he did not also still have a duty to register. The whole purpose of the registration section is to provide a manpower pool from which inductees can be selected; registration is but the necessary first step in the congressional scheme for processing, classifying, and selecting individuals for training.[7] See *United States* v. *O'Brien*, 391 U. S. 367, 377 (1968). And the instant regulation, declaring that the duty to register "shall continue at all times," is but one of numerous provisions and regulations in the Selective Service Act that reflect the concept that continuing duties are essential if this orderly induction process is to take

---

[7] This view of the registration provisions, relating them to the induction provisions as a reservoir to a pipeline, was repeatedly emphasized in the hearings on the 1940 Act and amendments thereto. See, *e. g.*, Hearings on H. R. 10132 before the House Committee on Military Affairs, 76th Cong., 3d Sess., 10–11, 15, 116 (1940); Hearings on S. 2126 before the Senate Committee on Military Affairs, 77th Cong., 1st Sess., 83 (1941) ("if you do not coordinate registration and induction, you are going to run into embarrassment"); U. S. Selective Service System, *supra*, n. 3, at 1–2 ("[t]he object . . . of registration is . . . to know where available manpower is and to be able to reach it . . .").

place.[8]  Even apart from the settled rule that the "interpretation expressly placed on a statute by those charged with its administration must be given weight by courts faced with the task of construing the statute," *e. g., Zemel* v. *Rusk,* 381 U. S. 1, 11 (1965), it seems clear to me that the regulation merely spells out an intent already inherent in the statutory scheme.[9]  Yet

---

[8] See 32 CFR §§ 1617.1, 1623.5 (registration and classification certificates must be kept in one's personal possession "at all times"); 32 CFR § 1641.7 (duty to keep local board informed of current status); 32 CFR § 1641.3 (duty "to keep [the registrant's] local board advised at all times of the address where mail will reach him").  The latter regulation was long ago interpreted as imposing a continuing duty to advise the local board of a change of address in a decision that rejected a claim similar to petitioner's that the then three-year statute of limitations barred prosecution, because the address was changed more than three years before the indictment was brought.  *United States* v. *Guertler,* 147 F. 2d 796 (C. A. 2d Cir. 1945).  Presumably under the majority's theory that "continuing duties" can only be created by express provision in the statute, this decision is overruled, and the continuing duty imposed by this regulation is brushed aside—all in the face of a statute that Congress knew "wouldn't be worth a dime to us in 2 years" if registration information and lists were not "kept up to date."  Hearings on S. 2126 before the Senate Committee on Military Affairs, 77th Cong., 1st Sess., 37, 38 (1941).

[9] In the Military Selective Service Act of 1967, enacted June 30, 1967, 81 Stat. 100, Congress added to § 454 (a) a provision that registrants who failed or refused to report for induction were "to remain liable for induction and when available shall be immediately inducted."  50 U. S. C. App. § 454 (1964 ed., Supp. IV).  Petitioner relies on this provision as an indication that Congress did not intend to impose continuing duties except where, as here, it used express language to that effect.  The legislative history shows just the opposite to be the case.  Congress assumed that, even without express language, liability for induction would continue until age 26; the amendment was prompted solely in order to "insure that a registrant who prolongs litigation of his draft classification beyond age 26" (when he would "no longer [be] liable for military service") "would nonetheless remain liable for induction, regardless of age . . . ."  H. R. Rep. No. 267, 90th Cong., 1st Sess., 30 (1967).  There is not

the majority holds that when dawn breaks on the unregistered male, six days after his 18th birthday, his crime is complete and ended; though the Act specifically declares that he is still liable for induction, he has no obligation to take the step that makes that induction possible. I for one cannot ascribe such inconsistent intent to Congress.

The Court does not even have the excuse that its construction is required in order to avoid a serious constitutional problem. Petitioner has argued that if his duty to register continues, he cannot be punished for failing to comply since late registration would necessarily be incriminating. See *Leary* v. *United States,* 395 U. S. 6 (1969); *Marchetti* v. *United States,* 390 U. S. 39 (1968); *Grosso* v. *United States,* 390 U. S. 62 (1968). But the Court of Appeals below drew dead aim on the defect in this argument, and the Court's opinion wisely refrains from relying on the suggested Fifth Amendment problem. For if this is a continuing offense, petitioner— as the Government concedes—is subject to only one prosecution based on his single uninterrupted course of conduct. See Model Penal Code, § 1.08, Comment 33–34 (Tent. Draft No. 5, 1956). Petitioner was subject to that prosecution six days after his 18th birthday; his continued failure to register did not subject him to any additional penalty beyond what he had already risked. Thus, though it may be conceded that late registration would have been incriminating, the statute here, unlike the statutes in *Marchetti, Grosso,* and *Leary* does not *compel* incrimination. Petitioner had nothing to gain in the form of avoiding an addi-

---

the slightest suggestion that Congress suspected that the registration and liability provisions of §§ 453 and 454—interrelated provisions which must fairly be read *in pari materia*—ever created anything other than continuing duties until the specified 26–year age limit was reached.

tional penalty by registering and revealing that his registration was late. The only possible "incentive" in this case stems from the fact that by registering, petitioner would have caused the statute of limitations to commence running, thus giving the Government only five years in which to prosecute instead of leaving prosecution open until age 31.[10] To suggest that this possibility of starting the statute running is sufficiently "attractive" to amount to "compulsion" for purposes of the Fifth Amendment is purest fancy.

The "continuing offense" is hardly a stranger to American jurisprudence. The concept has been extended to embrace such crimes as embezzlement,[11] conspiracy,[12] bigamy,[13] nuisance,[14] failure to provide support,[15] re-

---

[10] Petitioner has suggested that if the duty to register is continuing, there is no logical stopping place for bounding the duty, so that "a person seventy years old can be prosecuted for having failed to register fifty-two years before at the age of eighteen." Brief for Petitioner 17. But the paraded horrible overlooks the fact that the same provisions that create the duty, also indicate that the duty ends at age 26—the age beyond which no one was ever required to register under this Act and this proclamation, and beyond which no one would normally have been liable for induction. See nn. 6, 8, *supra;* S. Rep. No. 1268, 80th Cong., 2d Sess., 6 (1948) ("[r]egistration is not required of persons who have reached the age of 26").

[11] See *State* v. *Thang,* 188 Minn. 224, 246 N. W. 891 (1933).

[12] See *Grunewald* v. *United States,* 353 U. S. 391 (1957); *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 253 (1940); *United States* v. *Kissel,* 218 U. S. 601 (1910).

[13] See *Cox* v. *State,* 117 Ala. 103, 23 So. 806 (1898); compare *People* v. *Brady,* 257 App. Div. 1000, 13 N. Y. S. 2d 789 (1939), with *Commonwealth* v. *Ross,* 248 Mass. 15, 142 N. E. 791 (1924).

[14] *E. g., State* v. *Dry Fork R. Co.,* 50 W. Va. 235, 40 S. E. 447 (1901).

[15] *Richardson* v. *State,* 30 Del. (7 Boyce) 534, 109 A. 124 (Ct. Gen. Sess. 1920); *Towns* v. *State,* 24 Ga. App. 265, 100 S. E. 575 (1919).

peated failure to file reports,[16] failure to register under the Alien Registration Act,[17] failure to notify the local board of a change in address,[18] and, until today, failure to register for the draft.[19]  Since the continuing-offense concept too freely applied can lead to tension with the purposes of a statute of limitations, we should undoubtedly approach the task of statutory interpretation with "a presumption against a finding that an offense is a continuing one . . . ."  Model Penal Code § 1.07, Comment (Tent. Draft No. 5, 1956).  But the presumption is by its nature rebuttable; if it is ever to give way, it must surely do so in a case such as this where every other guide to statutory interpretation points to a contrary legislative intent.  To hold otherwise—to erect as the majority does an absolute bar to finding a continuing offense in the absence of express statutory language—is to shirk our judicial responsibility of interpreting Acts of Congress as they come to us, without insisting that Congress make our task easier by using some particular form of words to express its intent.[20]  Our own cases dis-

---

[16] See *Hanf* v. *United States*, 235 F. 2d 710 (C. A. 8th Cir.), cert. denied, 352 U. S. 880 (1956).

[17] *United States* v. *Franklin*, 188 F. 2d 182 (C. A. 7th Cir. 1951).

[18] *United States* v. *Guertler*, 147 F. 2d 796 (C. A. 2d Cir. 1945); see n. 8, *supra*.

[19] See *Fogel* v. *United States*, 162 F. 2d 54 (C. A. 5th Cir.), cert. denied, 332 U. S. 791 (1947); *Gara* v. *United States*, 178 F. 2d 38, 40 (C. A. 6th Cir. 1949), aff'd by an equally divided Court, 340 U. S. 857 (1950); *McGregor* v. *United States*, 206 F. 2d 583 (C. A. 4th Cir. 1953).  But cf. *United States* v. *Salberg*, 287 F. 208 (D. C. N. D. Ohio 1923) (holding the duty under the 1917 Act not to be continuing).

[20] Similarly, the requirement that criminal statutes be strictly construed in determining the substantive offense in order to prevent problems of fair warning, cf. *United States* v. *Universal Corp.*, 344 U. S. 218 (holding that defendant's acts constituted a continuing course of conduct, subject only to one prosecution), does not lead to the majority's *per se* rule in deciding what type of offense is

tinguish the "instantaneous" from the "continuing" offense on the theory that in the former case, the illegal aim is attained as soon as every element of the crime has occurred, whereas in the latter case, the unlawful course of conduct is "set on foot by a single impulse and operated by an unintermittent force," until the ultimate illegal objective is finally attained. *United States* v. *Midstate Co.,* 306 U. S. 161, 166 (1939); see also *United States* v. *Universal Corp.,* 344 U. S. 218, 224 (1952). The latter definition fits this case precisely. By his own testimony, petitioner admits that he set out to evade registration and liability for the draft. That aim could only be accomplished by remaining unregistered until he was past 26—the age of prime liability. If he had succeeded in reaching 26 and escaping liability, the Government should have its five years to detect and punish his illegal course of conduct. As it is, the Court holds that petitioner not only succeeded in his aim, but was immune from prosecution for his unlawful conduct at the age of 23. While all around him, young men were being inducted, 26-year-olds first, petitioner at 18 years and 6 days is forever free of any duty—and at 23 is forever free from prosecution for his initial failure—to place himself, like them, into the pool from which inductees are selected. I cannot agree. I would affirm.

---

involved for purposes of the statute of limitations. Given the explicit provisions of § 453, the "continuing-duty" regulation, and the consistent administrative interpretation of the Act, there can be no suggestion that petitioner did not have fair warning that he was required to register, or that petitioner was unfairly led into thinking that repose would be his when he reached 23.