11-4826-cr
United States v. Williams

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: November 27, 2012     Decided: September 23, 2013)

Docket No. 11-4826-cr

------------------------------------

UNITED STATES OF AMERICA,

Appellee,

- v -

GLENFORD E. WILLIAMS,
AKA Sealed Defendant 1, AKA Glenford Emmanuel Williams, AKA Glenford
Williams, AKA Glenford Brookes,

Defendant-Appellant.

------------------------------------

Before:  SACK, CHIN, AND LOHIER, Circuit Judges.

Glenford Williams appeals from a judgment of conviction for

illegally reentering the United States following deportation, in violation of 8

U.S.C. § 1326(a)(2) and (b)(2), entered on November 14, 2011 in the United States

District Court for the Southern District of New York (P. Kevin Castel, Judge).  We

conclude, as did the district court, although for different reasons from those given by the court, that the statute of limitations had not run at the time that Williams was indicted.

Affirmed.

ANDREA L. SURRATT (Brian A. Jacobs, on the brief), Assistant United States Attorneys, for Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, for Appellee.

YUANCHUNG LEE, Federal Defenders of New York, New York, New York, for Defendant-Appellant.

SACK, Circuit Judge:

Glenford Williams had been deported[1] from the United States in September of 1996 by order of the then-United States Immigration and Naturalization Service ("INS")[2] following a conviction for the commission of an

_____

[1] The terminology has since changed. "Deportation" is now generally referred to as "removal": The "Illegal Immigration Reform and Immigrant Responsibility Act . . . enacted in September 1996 . . . realigned the vocabulary of immigration law, creating a new category of 'removal' proceedings that largely replaces what were formerly . . . deportation proceedings." Gerald L. Neuman, "Habeas Corpus, Executive Detention, and the Removal of Aliens," 98 Colum. L. Rev. 961, 966 (1998), quoted in Fernandez-Vargas v. Gonzales, 548 U.S. 30, 34 n.1 (2006).

[2] "On March 1, 2003, the Immigration and Naturalization Service [INS] was reconstituted as the Bureau of Immigration and Customs Enforcement

aggravated felony under New York state law. Until his deportation, Williams, a citizen of St. Kitts, had been a lawful resident of the United States. He returned to the United States shortly after and was arrested in 1999 for an unrelated offense.

Under 8 U.S.C. § 1326(a), any person who has been deported and "thereafter . . . enters, attempts to enter, or is at any time found in, the United States" is guilty of illegal reentry. Although the INS learned of his 1999 arrest in 2002, Williams was not arrested for illegal reentry until 2010. Williams argues that he was "found in" the United States in 2002 and that the five-year statute of limitations then began to run on his reentry offense and had expired by the time of his 2010 arrest and indictment. He separately argues that, pursuant to 8 U.S.C. § 1326(d), the assistance of counsel provided at the deportation hearings underlying his 1996 deportation was ineffective.

The facts leading up to Williams's deportation, and ultimately to this appeal of his illegal reentry conviction, are as follows:

---

("ICE") and the Bureau of U.S. Citizenship and Immigration Services, both within the Department of Homeland Security." Monter v. Gonzales, 430 F.3d 546, 548 n.1 (2d Cir. 2005); see also Singh v. United States Dep't of Homeland Sec., 526 F.3d 72, 75 n.1 (2d Cir. 2008).

<u>Travel to U.S.</u>

Williams was born in St. Christopher and Nevis, known more commonly as St. Kitts,[3] in the British West Indies, in 1956. He came to the United States at age seventeen. He became a lawful resident in 1983 upon marrying an American citizen. They had three children together.

<u>1989 Conviction</u>

In September 1989, after entering into a cooperation agreement with the government, Williams was convicted in the United States District Court for the District of Maine of conspiracy to possess cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Williams was sentenced principally to 27 months' imprisonment, which was at the bottom of the Guidelines range.

<u>1996 Deportation</u>

As a result of Williams's conviction, the INS initiated removal proceedings against him. An Immigration Judge ("IJ") ordered that Williams be deported, which he was on September 13, 1996. Shortly thereafter, though, he surreptitiously returned to the United States.

---

[3] <u>See</u> http://www.country-data.com/cgi-bin/query/r-3310.html (last visited on August 23, 2013). "St. Kitts" is also the familiar name for "Saint Christopher" island, a constituent part of the country. <u>See</u> <u>id.</u>

<u>1999 Arrest</u>

On February 7, 1999, Williams was arrested by the New York Police Department ("NYPD") in Manhattan for driving with a forged license.  He was arraigned on February 8, 1999, and released on his own recognizance.  On March 2, 1999, a bench warrant was issued for his arrest.  The NYPD tried on March 8 and June 11, 1999, to locate Williams in order to arrest him, but was unsuccessful.

Williams went to the Department of Motor Vehicles shortly after his arrest, on February 17, 1999, to reinstate his driver's license, and avers that he believed –- erroneously, he admits -- that in light of his actions to reinstate his license, the case against him had been resolved.  Williams also asserts that from 1999 through 2010, he "lived continuously, openly, and under his true identity" in the boroughs of Manhattan and the Bronx.  Appellant's Br. at 19.

<u>2002 Validation</u>

In February of 2002, a law enforcement specialist with the INS learned of Williams's 1999 arrest in the United States, which, as is evident, took place nearly three years after he was deported.  The specialist acquired this information through a process known as "validation," which involves periodic updating of the National Crime Information Center database.  The government

acknowledges that the documents in Williams's file reflect that it was validated on February 17, 2002, and therefore contained information about his 1999 arrest.

According to the government, there are about twenty specialists who perform validation on approximately 280,000 records each year. It was standard procedure at the time for an officer, upon discovering records of an arrest, to forward the information to an INS agent for review. The INS agent would then typically determine whether to forward the information to a field office for investigation and, potentially, prosecution. There is no evidence in the record that the information uncovered about Williams's 1999 arrest was forwarded pursuant to this process.

2010 Arrest

The record reflects that no attempt was made to locate Williams until Autumn 2010. Then, Department of Homeland Security Immigration and Customs Enforcement ("ICE") officials arrested approximately 100 deported persons in what was termed as "Sweeps Week." At that point, an ICE officer conducted a search of public databases that showed that Williams had been in a traffic accident in 2008 and revealed evidence of several summonses for parking violations directed to Williams between 2008 and 2010. The databases contained possible addresses for Williams. Williams was apprehended at one of these

addresses in the Bronx in November 2010. He was indicted in the United States District Court for the Southern District of New York and charged with illegal reentry in violation of 8 U.S.C. § 1326(a)(2) and (b)(2).

Williams's Initial Challenge

Williams moved to dismiss the indictment, challenging it on two grounds. First, in light of the fact that a five-year limitations period governs an illegal reentry offense, 18 U.S.C. § 3282(a), Williams argued that the statute of limitations had run. He argued that his crime was completed for limitations purposes in 2002 when the INS validation process revealed that he was arrested in the United States in 1999, thereby placing his 2010 arrest and indictment well outside of the five-year limitations period.

The government responded that the offense had not been completed because immigration authorities did not locate Williams in 2002, at which time it had evidence only of his general whereabouts three years before, and that he had therefore not been "found in" the United States at the time. The government also argued that even if the statute of limitations had begun to run in 2002, the statute was tolled until Williams's arrest in 2010 because Williams was fleeing from justice within the meaning of 18 U.S.C. § 3290.

7

Second, Williams collaterally attacked his 1996 deportation order, arguing that he received ineffective assistance of counsel at the deportation proceeding. Williams based this attack in part on the fact that his counsel failed to highlight to the IJ the extent to which Williams had cooperated with the government in connection with his 1989 drug conviction.

The government opposed this claim, too, arguing that Williams had not been prejudiced by his counsel's error because, among other things, the IJ had copies of records, including the Presentence Report, containing descriptions of the extent of Williams's cooperation in the case and the IJ referred generally to those records.

District Court Memorandum and Order

On August 5, 2011, the district court (P. Kevin Castel, Judge) issued an unpublished memorandum and order denying Williams's motion. See United States v. Williams, No. 10-cr-1081 (S.D.N.Y. Aug. 5, 2011). The district court concluded that the statute of limitations had been tolled under 18 U.S.C. § 3290 because Williams had been fleeing from justice. Id., slip. op. at 6. The district court based this conclusion on, among other things, the fact that after Williams's 1999 arrest, he failed to make contact with law enforcement authorities or make an appearance to resolve the charges against him. Id.

8

The district court also concluded that Williams had not demonstrated that his immigration counsel provided ineffective assistance in the deportation hearings. Id. at 7-10. The court concluded that Williams's cooperation had been raised before the IJ because the Presentence Report was cited by counsel in the proceeding and read into the record. Id. at 9-10. Williams therefore could not demonstrate prejudice arising from his counsel's alleged ineffectiveness.

Bench Trial

On September 20, 2011, the district court conducted a bench trial based on stipulated facts concerning Williams's 1989 drug conviction, 1996 deportation, 1999 traffic arrest, and 2010 illegal reentry arrest. The court found Williams guilty of illegal reentry pursuant to 8 U.S.C. § 1326(a)(2) and (b)(2).

On November 10, 2011, the district court sentenced Williams principally to 24 months' imprisonment.

Williams appeals.

**DISCUSSION**

I. Standard of Review

Interpretations of statutes are pure questions of law, and we therefore review de novo Williams's claim that he was "found in" the United

States in 2002 within the meaning of sections 1326(a) and (b)(2). United States v. Delis, 558 F.3d 177, 180 (2d Cir. 2009).

With regard to Williams's section 1326(d) ineffective assistance claim, we review the district court's factual findings for clear error and its conclusions of law de novo. United States v. Cerna, 603 F.3d 32, 39 (2d Cir. 2010).

II. Illegal Reentry

Under section 1326(a), any person who has been deported and "thereafter . . . enters, attempts to enter, or is at any time found in, the United States" is guilty of illegal reentry. The issue on this appeal is when Williams's offense of being "found in" the United States was completed and, based upon that date, whether the statute of limitations had run at the time of his 2010 arrest.

Williams's illegal reentry offense is governed by the five-year statute of limitations for non-capital criminal offenses set forth in 18 U.S.C. § 3282(a). The limitations period was "designed principally to protect individuals from having to defend themselves against charges supported by facts that are remote in time." United States v. Rivera-Ventura, 72 F.3d 277, 281 (2d Cir. 1995). It is to be "liberally interpreted in favor of repose." Id. (quotations and citation omitted).

The limitations period begins "to run when a crime is 'complete,' thereby 'encouraging law enforcement officials promptly to investigate suspected criminal activity.'" Id. (quoting Toussie v. United States, 397 U.S. 112, 115 (1970)). At the same time, "the defendant's right to avoid perpetual jeopardy" must be balanced against "the government's need for sufficient time to discover and investigate the crime." United States v. DiSantillo, 615 F.2d 128, 135 (3d Cir. 1980).

When the offender is a fugitive, this balance tilts in favor of the government. Indeed, the putative defendant cannot create his or her own tolling of the statute of limitations by successfully evading the authorities. Simply put, the statute of limitations does not "extend to any person fleeing from justice." 18 U.S.C. § 3290.

The district court concluded that Williams was a fugitive and therefore that the statute of limitations did not extend to him. We do not reach this issue because we conclude that Williams was not "found in" the United States in 2002, as he argues, but was instead "found" here in 2010. Accordingly, only then did the statute of limitations begin to run.[4]

---

[4] Although the district court did not reach this issue in its opinion, "[w]e may . . . affirm on any basis for which there is a record sufficient to permit conclusions of law, including grounds upon which the district court did not

The seminal illegal reentry case in this Circuit is United States v. Rivera-Ventura, 72 F.3d 277 (2d Cir. 1995). As we conceived of the issue, the offense of being "found in" the United States is somewhat "complex, since it depends not only on the conduct of the alien but also on acts and knowledge of the federal authorities." Id. at 281. We concluded there that "the offense of being 'found in' the United States in violation of § 1326(a) is not complete until the authorities both [(1)] discover the illegal alien in the United States, and [(2)] know, or with the exercise of diligence typical of law enforcement authorities could have discovered, the illegality of his presence." Id. at 281 (citations omitted).

Here, the second requirement is satisfied: Federal officials knew that Williams, if in the United States, was here illegally in light of the fact that they knew he had been deported in 1996. And in any event, it seems to us that the INS agent who performed the validation in 2002, thereby uncovering the 1999 arrest, could have confirmed the illegality of Williams's presence at that time "with the exercise of diligence typical of law enforcement authorities." Id.

---

rely." Cromwell Assocs. v. Oliver Cromwell Owners, Inc., 941 F.2d 107, 111 (2d Cir. 1991); see also United States v. White, 980 F.2d 836, 842 (2d Cir. 1992).

The parties' dispute, and our inquiry, focuses on the first requirement: that officials had "found" Williams, or as we put it in <u>Rivera-Ventura</u>, had "discover[ed] [Williams] in the United States," <u>id.</u>, within the statute of limitations period.

The government argues that an individual is found or discovered only when he or she is "physically located." Gov't's Br. at 16. According to this line of reasoning, the statute would have begun to run only when the ICE officers located Williams in 2010. The government asserts as a justification for this approach that it would be impractical to force authorities to investigate immigration-related information in each of the tens of thousands of criminal records reviewed each year.

Williams contends to the contrary that when federal authorities possess a lead that would have, if pursued, resulted in the apprehension of the person who illegally reentered, the person has at that time been discovered or "found." Williams asserts that publicly available records allowed law enforcement to locate him in 2002 as easily as they did when they apprehended him in 2010. Williams therefore relies upon a strong interest in repose and in prompt investigation of crime, and in protecting the accused from having to defend against offenses remote in time.

Williams's approach would require law enforcement authorities to follow up on every piece of material information entered into a large system supervised by a limited staff, however impracticable this may be in light of the proverbial haystack before them. See, e.g., United States v. Garcia, 606 F.3d 1317, 1325 n.8 (11th Cir. 2010) (determining that the statute for an illegal reentry case could not begin to run when immigration forms were submitted to immigration authorities because such a rule would "all but mandate [that] low-level employees . . . scan continuously the stream of paper flowing across their desks, lest a later prosecution be barred by the statute of limitations").

Williams's approach would also impose upon authorities the very diligence requirement in investigating and finding the person who illegally reentered that we declined to impose in Rivera-Ventura, 73 F.3d at 282. There, we recognized such a requirement that authorities discover what they can with reasonable diligence only with respect to whether the authorities knew that the alien's presence was illegal, and not on the process of discovering the alien. Id.

Similarly declining to put such an onus on immigration authorities, other courts have emphasized that the statute of limitations does not begin to run when the government "should have discovered" the person who illegally reentered in the country. United States v. Gordon, 513 F.3d 659, 664-65 (7th Cir.

14

2008); see also United States v. Uribe-Rios, 558 F.3d 347, 354 (4th Cir. 2009) (declining to conclude that the statute had begun to run solely because the alien "should have been found" by the government).  We agree with that approach, and we reject Williams's argument that a reasonable diligence requirement applies to the first prong of the Rivera-Ventura test.  Indeed, in somewhat different circumstances, we have refrained from adopting a rule that would make immigration authorities employ such sweeping exploratory law enforcement measures, declining to make them "responsible for any immigration-related information discovered in state investigations of the hundreds of thousands of prisoners in state custody at any given time."  United States v. Mercedes, 287 F.3d 47, 55 (2d Cir. 2002)(emphasis omitted).

At the same time, it is not altogether clear what the government means when it asserts that a person is "found" or discovered when he or she is "physically located."  We doubt that authorities must make physical contact with the person who has illegally reentered in order for him or her to be "found."  Such an approach would give insufficient weight to the requirement that federal authorities "promptly [] investigate suspected criminal activity," Toussie, 397 U.S. at 115, especially when they have read and processed information providing the whereabouts of a person who has illegally reentered.

15

In light of these competing considerations, we conclude that a person who has illegally reentered is "found in" the United States when his or her "presence is discovered," United States v. Whittaker, 999 F.2d 38, 41-42 (2d Cir. 1993), which we understand to mean that the federal authorities possess reliable information as to the alien's whereabouts.

We do not limit the definition of "found in" to the moment when authorities make physical contact with the person in question. The government may need "sufficient time to discover and investigate the crime," Di Santillo, 615 F.2d at 135, but it can and often does engage in those investigatory acts and discover a person who has illegally reentered before it physically confronts him or her. This is particularly the case where authorities have located the person's whereabouts, whether in a residence or workplace or some comparable site, in the United States.

This understanding of the meaning of "found in" is congruent with our conclusion in Rivera-Ventura, 72 F.3d at 282, that "Congress's use of the word 'found' suggests a focus on the time at which the authorities' location of the alien and their knowledge of the illegality of his presence converge, and that focus indicates that the offense is complete at the time of that convergence." Authorities may be said to have "found" or "located" an alien, then, when they

have reliable information as to his or her likely physical location in the United States and knowledge that such presence is illegal.

Under this standard, the statute of limitations did not begin to run on Williams's reentry offense in 2002. The notes that the ICE technician put in Williams's file in 2002 regarding his 1999 arrest were not clearly indicative of his then-likely location, providing only evidence that he had been arrested in the United States three years earlier. This was insufficient to provide authorities with reliable information as to Williams's whereabouts in 2002.

Authorities found Williams at the earliest in or about the Autumn of 2010, when they searched public databases and observed that Williams had been in a traffic accident in 2008 and generated evidence of recent parking violations –- including one in June of 2010 -- which turned up possible New York addresses for Williams, all with knowledge that he had illegally reentered in light of his deportation.

Whatever the precise date in 2010 that authorities discovered this information is of no import because his arrest shortly thereafter was in any event within the limitations period. For that reason, we agree with the district court that Williams's statute of limitations defense fails.

III. Collateral Attack

Williams also argues that his counsel provided ineffective assistance in his underlying removal proceedings and that this ineffective assistance renders his 1996 deportation invalid. If Williams succeeds on this argument, he can "defend against [the] charge [of illegal reentry] by challenging the validity of the deportation order upon which the charge is predicated." United States v. Copeland, 376 F.3d 61, 66 (2d Cir. 2004). To do so, Williams must establish, in part, that "the entry of the order was fundamentally unfair." 8 U.S.C § 1326(d)(3).

To demonstrate fundamental unfairness in this context, Williams must show "both a fundamental procedural error and prejudice resulting from that error." Cerna, 603 F.3d at 40-41. In other words, he must show (1) that a "competent attorney" would not have made the error; and (2) "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id.

Williams had applied for discretionary relief from deportation pursuant to section 212(c) of the Immigration and Nationality Act, 8 U.S.C. § 1182(c) (repealed 1996). Section 212(c) permitted the IJ "to waive the grounds for deportation under certain conditions." St. Cyr v. I.N.S., 229 F.3d 406, 410 (2d Cir. 2000). In determining whether to exercise this discretion, the IJ was required to

"balance the adverse factors evidencing an alien's undesirability as a permanent resident with the social and humane considerations presented in his behalf to determine whether . . . relief appeared to be in the best interests of this country." Cerna, 603 F.3d at 41.

> [Such a]dverse factors include: (1) the nature and circumstances of the exclusion ground at issue; (2) other immigration law violations; (3) the alien's criminal record; and (4) evidence indicative of an alien's undesirability as a permanent resident.
>
> Favorable factors include: (1) family ties to the United States; (2) many years of residency in the United States; (3) hardship to the alien and his family upon deportation; (4) United States military service; (5) employment history; (6) community service; (7) property or business ties; (8) evidence attesting to good character; and, in the case of a convicted criminal, (9) proof of genuine rehabilitation.

Id. We have noted, in considering an analogous provision of the Immigration and Nationality Act, that an alien convicted of a serious drug trafficking offense must make a heightened showing of "offsetting favorable evidence," involving "unusual or outstanding equities." Samuels v. Chertoff, 550 F.3d 252, 258 (2d Cir. 2008) (quotations, citation, and emphasis omitted).

The IJ rejected Williams's section 212(c) application for several reasons. He first noted the seriousness of Williams's offense. He was troubled by the fact that Williams involved his young daughter in the Maine drug offense.

19

And pointing to Williams's testimony that he would not have engaged in the conspiracy had he been aware of the possible punishment, the IJ concluded that Williams possessed only superficial remorse. The IJ also rested the denial on his suspicion that Williams had been under-reporting income so as to obtain public benefits. Finally, the IJ was critical of Williams's performance as a husband and father, concluding that Williams's deportation would not result in financial hardship for his already struggling family.

Williams contends that his attorney failed him during these proceedings in two respects. First, counsel failed to bring to the IJ's attention that Williams had assisted authorities after his arrest, pleading guilty, testifying before the grand jury, and ultimately testifying at his co-defendant's trial. Second, counsel failed to perfect Williams's appeal to the Board of Immigration Appeals after the IJ denied his section 212(c) application.

The government responds that counsel was not ineffective because information about Williams's assistance was indeed before the IJ. It argues that a paragraph in the Maine Presentence Report did indicate that Williams had testified against a co-defendant, and that, based on the IJ's reliance on certain other paragraphs in the Report, the IJ was familiar with its contents.

We conclude that Williams's ineffective assistance claim fails. First, the IJ relied upon multiple grounds for denying the section 212(c) application –-including the seriousness of Williams's offense, his lack of remorse, his dishonesty with respect to public benefits, and his family life. Williams's cooperation, while important, would have been weighed against these other factors and likely would not have met the burden of the heightened showing of "offsetting favorable evidence" involving "unusual or outstanding equities." Samuels, 550 F.3d at 258. To be sure, the evidence of cooperation would have gone in the balance against the negative grounds to be considered. But the negative grounds were many, and the evidence of cooperation alone seems extremely unlikely to have offset those many grounds, or to involve anything of an unusual or outstanding nature.

Moreover, we do not think clearly erroneous the district court's finding that evidence of Williams's cooperation was before the IJ. The IJ needed not recite all of the evidence he reviewed. See Ming Shi Xue v. BIA, 439 F.3d 111, 124 n.15 (2d Cir. 2006). He is presumed to have reviewed the factual record before him, see United States v. Russo, 281 F. App'x 43, 46-47 (2d Cir. 2008), which included evidence of Williams's cooperation. Indeed, the IJ read into the record parts of the very Report that outlined Williams's cooperation. There is

21

thus no reason to doubt the district court's conclusion that evidence of Williams's cooperation was already in the balance that tipped against Williams.

The district court therefore did not err in reaching its conclusion that counsel's failure to raise Williams's cooperation did not cause Williams prejudice. Considering the breadth of the reasons the IJ gave for denying section 212(c) relief, we cannot conclude that there is a "reasonable probability," Cerna, 603 F.3d at 41, that Williams's testimony against his co-defendant would have changed the IJ's mind.

And because Williams's showing, even with evidence of his cooperation, was weak, and his burden under section 212(c) heavy, his counsel's failure to perfect his appeal similarly did not cause him prejudice. Williams's appeal was, in our view, exceedingly unlikely to succeed. There is therefore no "reasonable probability" that the BIA would have reversed the IJ and granted Williams the section 212(c) relief he sought.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is affirmed.